

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES R. PRINCE,                    :
        PETITIONER          :
                         :
        V.                  :    CIVIL ACTION NO. 1 CV-00-1181
                         :
KENNETH D. KYLER, ET AL.  :
        RESPONDENT         :
                         :

**ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

    AND NOW, comes the attorney for Respondent and answers the petition for writ

of habeas corpus as follows:

    1.      Admitted

    2.      Admitted

    3.      Admitted

    4.      Admitted.

    5.      Admitted.

    6.      Admitted

    7.      Admitted

    8.      Admitted

    9.      Admitted

    10.    Admitted

    11.    (a) Admitted

            (b) Admitted

            (c) Admitted

FILED
WILLIAMSPORT
AUG 25 2000

PER _____ DEPUTY CLERK

(d) Admitted.  By way of further answer the procedural history of this matter has been succinctly set forth up through May 3, 1994 in the opinion of the Superior Court of Pennsylvania filed at 00295 Harrisburg 1993 dated May 3, 1994, a copy of which is attached hereto as Exhibit 1.

11.1    Admitted

11.2    Admitted

11.3    Admitted.   By way of further answer, petitioner herein failed to appeal the other issues raised in his post conviction petition.  See Exhibit 1 attached hereto.  Those issues were set forth in the Order of the lower court dated January 13, 1992, and included the following: (a) trial counsel was ineffective for failing to use medical records in cross-examining the victim to demonstrate she had not been injured by an automobile; (b) trial counsel was ineffective in failing to establish the defendant was set up by the victim because of an alleged pre-existing dispute between the victim and the defendant's wife; (c) counsel was ineffective in failing to object to comments made by the sentencing judge; (d) trial counsel was ineffective in failing to cross-examine the victim concerning inconsistencies in his statement.  See Order of January 13, 1992, attached hereto as Exhibit 2.

11.4    Admitted

11.5    Admitted

11.6    Admitted

11.7    Admitted

11.8    Admitted

11.9    Admitted

11.10   Admitted

11.11   Admitted

11.12   Admitted

11.13   Admitted

12.A.   Denied, that the conviction was obtained by use of evidence gained

pursuant to an unconstitutional search and seizure.  Petitioner contends the

introduction into evidence of two knives was introduced solely to prejudice the

jury, that the victim gave conflicting descriptions of the knife used and that the

police seized the knife introduced into evidence illegally.  It is submitted that for

the reasons set forth by the Court of Common Pleas of Lycoming County in the

Opinion of March 25, 1997 at p.3 and September 3, 1997, at p.10 the issue is

without merit.  See Opinion of March 25, 1997 attached hereto as Exhibit 3, and

Opinion of September 3, 1997 attached hereto as Exhibit 4.  By way of further

answer the victim identified the knife introduced into evidence as being similar

to the knife used in the commission of the crime.  N. T. 52-53, 75-76, 81-82,

attached hereto as Exhibit 5.  While the victim could not state with certainty the

knife seized was the one used in the commission of the crime, this testimony

goes to the weight and not the admissibility of the knife.  It should also be noted

that Officer Bower testified that the knife seized from the defendant's residence

matched the description of the knife given by the victim.  N.T. 143-44, attached

hereto as Exhibit 6.  This testimony established that the defendant possessed a

knife similar to the knife possessed by the person who assaulted her.  Again it is submitted this testimony was clearly relevant with the weight to be given the evidence a matter to be determined by the jury.

It is further submitted that as found by the lower court in its opinion of March 25, 1997, and September 3, 1997, copies of which are attached hereto as Exhibits 3 and 4, the defendant was not prejudiced by the introduction of the knives into evidence. To be entitled to relief based on a claim of ineffective assistance of counsel pursuant to <u>Strickland v. Washington</u>, 1045 S.Ct. 2052 (1984), a defendant must establish prejudice, that is a reasonable probability that the outcome of the proceeding would have been different.  In addition to the reasons set forth by the lower court set forth in Exhibit 4 at p.10-12 the defendant gave a statement to the police indicating he possessed a knife similar to the one described by the victim.  N.T. 143(1) - 143(2), attached hereto as Exhibit 7. Accordingly, for the reasons set forth by the lower court and because the defendant admitted owning a knife similar in description to that testified to by the victim, the defendant has not established a reasonable probability that the outcome of the proceeding would have been different had the knife not been introduced into evidence.  See also the discussion set forth in paragraph 12B concerning William v. Taylor, 120 S.Ct. 1495 (2000).

The petitioner also contends that the knife introduced into evidence was illegally seized.  This issue will be addressed in the next portion of the answer.

12.B    Denied that counsel was ineffective for failing to challenge a search and seizure.  Petitioner contends that counsel was ineffective for failing to challenge

the seizure of a knife on the basis that the police allegedly told petitioner's wife that only clothing was to be seized and that the removal of the knife from a kitchen drawer was beyond the scope of the consent. It is submitted first that any evidence the police obtained during the course of an otherwise lawful search could be seized pursuant to the plain view doctrine. Horton v. California, 110 S.Ct. 2301 (1990). Instantly it is submitted that it was not inappropriate for the police while searching for articles of clothing, to open kitchen drawers for clearly clothing could be found in such a location. Because the police were entitled to open the kitchen drawer once they observed a knife matching the description of the one described by the victim they were lawfully entitled to seize it. It is therefore submitted that assuming petitioner's contention concerning the search is accurate, pursuant to the plain view doctrine the subsequent seizure of the knife was lawful.

Moreover, for purposes of this case the factual basis of petitioner's claim that the police were only searching for clothing and only informed petitioner's wife of that is inaccurate.

In this case two separate searches pursuant to consent were given by petitioner's wife. The first search occurred on December 13, 1988, and only articles of clothing were removed from the residence. N.T. 201-208, attached as Exhibit 8. This search was authorized by the petitioner's wife as demonstrated by the consent to search form attached hereto as Exhibit 9. Subsequent to the search of December 13, 1988, which resulted in the seizure of various articles of clothing the police went to petitioner's residence on December 19, 1988. At this

time pursuant to consent given by petitioner's wife the police seized the knife at issue in this case. N.T. 213-214, Attached hereto as Exhibit 10; Police report of Agent Croft dated December 19, 1988, attached hereto as Exhibit 11. Accordingly since the knife was obtained pursuant to a valid consentual search counsel cannot be deemed ineffective.

By way of further answer, petitioner's right to relief based upon a claim of ineffective assistance of counsel is governed by the habeas corpus statute, 28 U.S.C. § 2254(d)(1)(1994 ed.Supp. 111) which precludes relief unless the adjudication by a state court of a federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." This requires a determination that the state court applied a legal rule that contradicted prior Supreme Court holdings or reached a different result from a Supreme Court case involving indistinguishable facts; or was unreasonable in applying the governing legal principle to the facts. Williams v. Taylor, 120 S.Ct. 1495 (2000). See also Ramdass v. Angelone, 120 S.Ct 2113 (2000).

Instantly the determination of whether counsel rendered ineffective assistance of counsel for failure to take steps to preclude the introduction into evidence of the knives is determined by the application of Strickland v. Washington, supra. Pursuant to Strickland a defendant is required to demonstrate prejudice, that is a determination that counsel's errors undermined the reliability of the verdict such that absent the error a reasonable probability existed that the outcome of the proceedings would have been different. Instantly the lower court

found that even if the knives should not have been put into evidence the truth

determining process was not so undermined that a reliable determination of guilt

or innocence could not have taken place, and that the outcome of the trial would

not have been different. See Exhibit 3 at p.3 and Exhibit 4 at p.10-12. Clearly

the Court utilized the <u>Strickland</u> standard in determining whether the defendant

was prejudiced, and clearly the court's application of the facts to the governing

legal standard was not unreasonable. Accordingly the defendant is not entitled to

habeas relief.

12.C    Denied that counsel was ineffective for failing to explain the level of

intoxication of witnesses presented by the Commonwealth thereby challenging

their credibility and for failing to request the Court instruct the jury in accord

with Pennsylvania Suggested Standard Jury Instructions 4.01 and 4.17. This

issue was thoroughly addressed in the opinion of the Honorable Judge Brown

attached herein as Exhibit 3 at p.1-2 and Exhibit 4 at p.7-9. In supplementation

the Commonwealth has attached hereto the portions of the transcripts referred to

in the opinion of Judge Brown as Exhibit 12. See also N.T. 231-246 attached

hereto as Exhibit 13. The Commonwealth has further attached hereto as Exhibit

14 and Exhibit 15 the Pa.S.S.J.I. (Crim) §4.07 and 4.17 petitioner contends

should have been given but were not. Additionally the Commonwealth has

attached hereto as Exhibit 16, the relevant portions of the jury instructions given

in this case which demonstrates that the Court instructed the jury substantially as

set forth in §4.17. Clearly the instructions as given were sufficient to apprise the

jury of the appropriate standard they were to utilize in assessing the credibility of the witnesses.

By way of further answer the Court did not err in failing to instruct pursuant to Pa. S.S.J.I. §4.07 (Crim) as that instruction is applicable only when identity is at issue and the identifying witnesses did not have a good opportunity to observe the individual identified, or had previously failed to identify the individual. See §4.07 (Crim) attached hereto as Exhibit 14. Instantly there was no issue concerning identification in this case, the sole issue was whether the defendant committed the various criminal acts alleged by the victim. See Exhibits 3, 4 and 13. Accordingly because identity was not at issue petitioner not only was not entitled to the instruction but could not have been prejudiced by the failure to give the instruction.

12. D   Denied that trial counsel was ineffective for failing to challenge the credibility of Commonwealth. By way of further answer the Commonwealth relies upon the answer set forth in paragraph 12C above. By way of further answer petitioner has failed to set forth any facts in support of his contention but has simply made allegations.

13.     Admitted. By way of further answer it is submitted all claims for relief raised by petitioner have been procedurally defaulted. Petitioner admits his state post-conviction petition was dismissed on procedural grounds - the failure to file a brief. Pursuant to Murray v. Carrier, 106 S.Ct. 2639 (1986) where federal claims have been defaulted in state court pursuant to an independent and adequate state procedural rule, habeas review of the claim is barred unless the

prisoner demonstrates cause and prejudice. Instantly the claim raised herein have been defaulted in state court by the failure of petitioner's post-conviction counsel to file a brief. This procedural default occurred in a state post-conviction proceeding, a proceeding for which there is no constitutional right to counsel. Coleman v. Thompson, 111 S.Ct. 2546 (1991). Where there is no right to counsel there can be no deprivation of effective assistance. Coleman v. Thompson, supra. Herein petitioner did not have his claim reviewed in state court due to counsel's failure to file a brief, clearly a procedural default. In Coleman, the default consistents of counsel's failure to file a timely state habeas appeal. As pointed out in Coleman, supra, in the absence of a constitutional violation, a petitioner bears the risk in federal habeas for all attorney errors made in the course of his representation, which includes the failure to follow procedural rules. As noted because petitioner was not constitutionally entitled to counsel in his post-conviction appeal, no constitutional violation occurred because of counsel's failure to file a brief. Where there is no right to counsel, any attorney error that results in default of the claims in state court cannot constitute cause to excuse the default in federal habeas. Coleman, supra. Accordingly because petitioner procedurally defaulted his claim in state court, and because petitioner has not only failed to try to establish cause for this default but would clearly be unable to do so this court is precluded from considering his claim.

14.    Admitted

15.    Admitted

16.    Admitted

17.     Admitted

By way of further answer the Commonwealth in paragraph 13 has alleged that petitioner is not entitled to federal habeas relief as he has procedurally defaulted his claim.

The Commonwealth has attached to this answer the portions of the trial testimony it believes to be relevant, and can furnish upon request the entire transcript of the trial and the sentencing proceedings conducted in this case.

Respectfully submitted,

Kenneth A. Osokow, Esquire
I.D. No. 22554
First Assistant District Attorney

8/25/00
Date

CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a copy of the foregoing

Answer to Petition for Writ of Habeas Corpus upon the following by :

Placing in certified mail in U. S. Mail to the following:

James Prince, BD-1018
SCI- Huntingdon
1100 Pike Street
Huntindon  PA  16654-1112


Kenneth A. Osokow, Esquire
First Assistant District Attorney
I.D. # 22554
Lycoming County Court House
48 West Third Street
Williamsport, PA 17701
(570) 327-2456

8/25/00
Date

J.A53054/93

COMMONWEALTH OF PENNSYLVANIA　　:　　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　　　:　　　　　PENNSYLVANIA
　　　　　　v.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
JAMES PRINCE,　　　　　　　　　　　:
　　　　　　　　Appellant　　　　　　:　　No. 00295 Harrisburg 1993

　　　　　　Appeal from the Post Conviction Hearing Act
　　　　　　March 25, 1993, in the Court of Common Pleas,
　　　　　　Criminal, Lycoming County, No. 89-10,014.

## *J U D G M E N T*

ON CONSIDERATION WHEREOF, *it is now here ordered and*

*adjudged by this Court that the judgment of the Court of*

*Common Pleas of*　　　LYCOMING　　　*County be, and the same*

*is hereby*　　AFFIRMED.

RECEIVED

MAY 4 1994

DISTRICT ATTORNEY

BY THE COURT:

*PROTHONOTARY*

Dated:　　May 3, 1994

Exhibit 1

U.A55094/95

COMMONWEALTH OF PENNSYLVANIA          :          IN THE SUPERIOR COURT OF
                                      :                 PENNSYLVANIA
            v.                        :
                                      :
JAMES PRINCE,                         :
                  Appellant           :          No. 00295 Harrisburg 1993

          Appeal from the Post Conviction Hearing Act
          March 25, 1993, in the Court of Common Pleas,
          Criminal, Lycoming County, No. 89-10,014.

     BEFORE:   CAVANAUGH, McEWEN and DEL SOLE, JJ.

MEMORANDUM:                                **FILED** MAY 3 1994

     This is a direct, <u>nunc pro tunc</u> appeal from a judgment of

sentence entered in Lycoming County by the Honorable Kenneth D.

Brown.  The morass that constitutes the procedural history of this

case is a vivid commentary on the pitfalls which may be encoun-

tered by a combination of less than diligent advocacy and self-

help action by a disappointed defendant.  In order to attempt to

put the present appeal in proper focus, we must undertake to

"summarize" the history of this case in order to, in some way,

facilitate its future scrutiny.

     Appellant, James R. Prince, was found guilty of rape and

related charges on June 21, 1989 after a jury trial.  He was

sentenced to an aggregate term of sixteen to thirty-five years

imprisonment.  On direct appeal appellant argued that his trial

counsel was ineffective for failing to request inspection of the

victim's counseling records maintained by the Wise Options for

Women ("WOW"), a rape counseling center.  A panel of this court

vacated the judgment of sentence and remanded the case on

September 20, 1990 for an evidentiary hearing to determine whether

counsel had a reasonable basis for failing to request the records,

J.A53054/93

and if not, whether the file contained such material that would
have assisted appellant in the presentation of a defense.
Commonwealth v. Prince, (18 HBG 1990, filed September 20, 1990).

Pursuant to the instructions of this court, Judge Brown con-
ducted an evidentiary hearing and reviewed the counseling records
in camera. On November 26, 1990, the trial court entered an order
denying appellant access to the records because it found that they
contain no material that would have served to assist his presenta-
tion of a defense and, therefore, counsel was not ineffective.[1]
Consequently, the judgment of sentence was reinstated. A notice
of appeal was filed, but this court quashed it as untimely in an
order dated March 6, 1991.

On April 30, 1991, appellant filed a pro se petition under
the Post Conviction Relief Act, 42 Pa. C.S.A. § 9541 et seq.,
alleging, inter alia, that appellate counsel was ineffective for
failing to timely file an appeal of the November 26, 1990 order.
Counsel was appointed and appellant's petition was amended. After
consideration of the matter, Judge Brown entered an order on
January 13, 1992 granting appellant the right to directly appeal
the November 26, 1990 order, nunc pro tunc, within thirty days.
All other claims in the amended PCRA petition were deemed to be
without merit and, accordingly, relief was denied without a
hearing.

---

[1] The order also denied appellant the right to cross-examine the
WOW counselor regarding the contents of the file. The court found
that 42 Pa. C.S.A. § 5945.1 affords sexual assault counselors a
privilege not to be examined without the prior written consent of
the victim.

J.A53054/93

Because appellant's requested relief was partially denied
without a hearing, the PCRA court was obligated to notify him of
its order via certified mail in accordance with Pa.R.C.P. 1507(d).
Due to a breakdown in the operations of the court, appellant did
not learn of the court order until sometime after April 6, 1992.
Upon learning of the January 13, 1992 order, appellant immediately
filed an obviously untimely pro se notice of appeal with this
court arguing that: 1) the PCRA court's failure to properly notify
him about the order excused the untimely appeal; and 2) the PCRA
court erred in partially denying his requested relief.  Based on
its review of the convoluted procedural history of this case and
the recommendations of Judge Brown in his opinion pursuant to
Pa.R.A.P. 1925(a), a panel of this court granted appellant the
right to appeal the November 26, 1990 order and remanded the case
for appointment of counsel and notice pursuant to Rule 1507(d).[2]
Commonwealth v. Prince, (324 HBG 1992, filed January 8, 1993).

Upon remand, Judge Brown entered an order on March 22, 1993
properly notifying appellant of the provisions of the January 13,
1992 order and appointing William Coury, III to represent him.  He
was also notified that he had thirty days to file an appeal.

Appellant then filed a Statement of Matters Complained of on
Appeal by and through his attorney, Mr. Coury, in which he unnec-
essarily alleged that original appellate counsel was ineffective

---

[2] The panel erroneously believed that appellant had filed prior
PCRA petitions and, therefore, stated that appointment of counsel
was discretionary.  Nevertheless, the court directed that counsel
be appointed.  Thus, although this was actually appellant's first
PCRA petition (and he was therefore entitled to counsel as of
right), the panel's error was harmless.

J.A53054/93

for failing to timely file a direct appeal of the trial court's November 26, 1990 order (which denied appellant access to the records held by the rape counseling center). Obviously, the court addressed this issue in its order of January 13, 1990 and reiterated its finding in its order of March 22, 1993. The trial court noted this fact in its opinion pursuant to Pa.R.A.P 1925(a), but nevertheless appropriately speculated that the real issues to be appealed were whether it erred in denying appellant access to the records of the rape counseling center and whether it erred in denying appellant's requested relief under the PCRA without an evidentiary hearing. The court concluded that it did not err in either instance and this appeal followed.

The sole substantive issue before us is:

> [w]hether appellant, who was convicted of
> rape, had a right to review the records of the
> victim, which records were held by Wise
> Options for Women, a rape counseling center,
> in order to adequately prepare his
> defense?[3]

---

[3] As stated above, the order of January 13, 1992 was entered in response to appellant's petition pursuant to the PCRA. That order found that his counsel was ineffective for failing to timely appeal the order of November 26, 1990 and granted him the right to appeal the November 26 order nunc pro tunc. The January 13 order denied all other relief sought under the PCRA. Thus, the order of March 22, 1993 reinstated appellant's right to directly appeal, nunc pro tunc, the order of November 26, 1990 while reaffirming the denial of his collateral claims. Conceivably, therefore, appellant could have raised both direct and collateral issues on this appeal. This rare, if not confusing, phenomenon has resulted in an erroneous caption to this memorandum. Appellant appeals from his judgment of sentence, specifically challenging the order of November 26, 1990. He has not appealed the disposition of his collateral claims.

4

J.A53054/93

Before addressing this issue, however, there are two preliminary
matters that require our attention. First, it would appear that
appellant waived the issue because he did not raise it in his
Statement of Matters Complained of on Appeal. See Pa.R.A.P.
1925(b). However, because the trial court addressed the issue sua
sponte, we find that it has been preserved for our review. Cf.
Commonwealth v. Metz --- Pa. ---, 633 A.2d 125 (1993) (issues
raised post-trial in a procedurally defective manner but neverthe-
less addressed by the trial court are preserved for appellate
review).

Second, in addition to his counseled brief, appellant has
filed a pro se brief alleging that counsel is presently ineffec-
tive because the counseled brief is "deficiently terse and overly
succinct." Consequently, he requests counsel to motion this court
for remand so that new counsel may be appointed. Although appel-
lant's counsel has not made such a motion, to do so would be
fruitless.

In Commonwealth v. Ellis, --- Pa. ---, 626 A.2d 1137 (1993),
the court gave four policy considerations pursuant to Article V §
10 of the Pennsylvania Constitution that preclude the review of
pro se briefs when counseled briefs are previously, simulta-
neously, or subsequently filed: (1) the pro se appellant's lack of
expertise and propensity for raising irrelevant arguments; (2) the
pro se appellant's ability to seek recourse under the Post
Conviction Relief Act, 42 Pa. C.S.A. § 9541 et seq., should
counsel's arguments not prevail and appellant is convinced that
his own unheeded arguments should have been presented; (3) the

5

J.A53054/93

addition of _pro se_ briefs, which are often "illiterate,"
"rambling," and "frustrating," would overwhelm an already overbur-
dened court; and (4) the importance of expert, focused appellate
advocacy. _Ellis_, 626 A.2d at 1140.  Ultimately, the court
concluded:

> A represented appellant may petition to
> terminate his representation; he may, acting
> pursuant to the rules of criminal procedure,
> proceed on his own behalf.  Conversely, he may
> elect to allow counsel to take his appeal,
> but, should counsel not prevail, assert
> counsel's ineffectiveness at a later time and,
> thus indirectly, assert the claims he would
> have made on direct appeal.  The only thing he
> may not do is confuse and overburden the court
> by his own pro se filings of briefs at the
> same time his counsel is filing briefs on his
> behalf.

_Id_. at 1141 (emphasis added).

Appellant elected to allow counsel to take the present appeal
and counsel has filed a brief on his behalf.  He cannot now allege
ineffective assistance when we have yet to address the merits of
the issue raised in his counseled brief.  To address such analle-
gation at this stage would commingle the direct and collateral
appeal processes and, therefore, defeat the purpose of the PCRA.
Appellant is not presently entitled to have new counsel appointed
simply because he is unhappy with the presentation of his coun-
seled brief.  We will not afford him a second opportunity to frame
the issues before us.  Therefore, in accordance with _Ellis_, _supra_,
we shall ignore the _pro se_ brief and address the issue in the
counseled brief.  If appellant is dissatisfied with the result, he
must seek other appropriate recourse.

6

J.A53054/93

Turning now to the sole issue presented in appellant's coun-
seled brief, appellant (who was convicted of rape) argues that the
court erred in denying him the right to review records held by the
Wise Options for Women, a rape counseling center where the victim
sought counselling.  He contends that the records were necessary
in preparation of his defense.  Alternatively, he contends that
the records may have been in the possession of the Commonwealth at
the time of trial.  Therefore, under Pa.R.Crim.P 305 he should
have been provided a copy of them.  Thus, he requests that we
remand this case for a hearing to determine whether the Common-
wealth did, in fact, have possession of the records.

We find no merit to appellant's argument.  In Commonwealth v.
Wilson, 529 Pa. 268, 602 A.2d 1290 (1992), the Supreme Court held
that 42 Pa. C.S.A. § 5945.1 creates an absolute privilege against
a defendant's access to the records of a rape crisis center.
Judge Brown drew a similar conclusion in his order of November 26,
1990. See supra note 1 and accompanying text.  Moreover, he
reviewed the records in camera and stated in his order that they
consist of a single page and "simply list dates which show when
contacts were made with the victim; the topic or substance of such
contacts is not revealed."  Finally, it is unnecessary to remand
this case for a hearing to determine whether the Commonwealth had
a copy of the records in light of the holding in Wilson, supra,
and the trial court's description of its meager contents.  We
conclude that appellant's access to the records would not have
benefitted his defense in any way.

7

J.A53054/93

The order of November 26, 1990 and judgment of sentence are
affirmed.

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA : No. 89-10,014

vs. : CRIMINAL

JAMES PRINCE, : Motion for
           Defendant : Post-Conviction Relief

O R D E R

        AND NOW, this 6th day of January, 1992, upon consider-
ation of Defendant's Amended Motion for Post-Conviction Relief,
and upon review of the record, the Court finds as follows:

    1. As the record reveals that Defendant
       attempted to file an appeal from the
       Court's November 26, 1990 Order but
       that such was returned for procedural
       irregularities and when finally filed
       was untimely, and since counsel must
       protect the appellate right of an
       accused where there is no waiver of
       that right, even where the appeal is
       "totally without merit," Commonwealth
       v. Wilkerson, 416 A.2d 477 (Pa. 1980),
       appellate counsel must be deemed in-
       effective and Defendant must be granted
       the right to appeal nunc pro tunc. Id.

    2. The remaining allegations of the in-
       effectiveness of appellate counsel (in
       the initial appeal from the sentencing
       order) for failing to raise allegations
       of ineffective assistance of trial
       counsel are without merit for the follow-
       ing reasons:

      a) The testimony of the victim was not
        that Defendant had hit her with his
        vehicle, but that he had tried to run
        her over but she ran and was able to get
        away, N.T., June 20, 1989 at 59,
        and thus failing to cross-examine her
        using medical reports that showed no
        injuries from an automobile was not
        ineffective.

Exhibit 2

b) The overwhelming evidence that the
victim had been severely beaten and
that her clothes had been ripped, in
addition to the evidence of the cir-
cumstances following the attack, in-
cluding the testimony of the passer-by
who rescued the victim and the fact
that she immediately called the police,
so strongly indicate that the victim
was <u>not</u> "setting up" Defendant that
trial counsel cannot be said to be
ineffective for failing to present
evidence of a pre-existing dispute
between Defendant's wife and the victim,
if indeed one existed.[1]

c) The record fails to reveal any comments
by the sentencing judge regarding Defen-
dant's religious beliefs; there could be,
therefore, no ineffectiveness in failing
to object to such.

d) The record shows no inconsistencies in
the victim's testimony; thus, trial
counsel could not be ineffective in
failing to use inconsistencies in cross-
examining her.

Accordingly, Defendant is hereby GRANTED leave to
appeal nunc pro tunc from this Court's November 26, 1990 Order,
and may file such appeal within thirty (30) days of the date of
this Order. In all other respects, Defendant's Amended Motion
for Post-Conviction Relief is hereby DENIED.

By The Court,

Kenneth D. Brown, Judge

cc: Court Administrator
    District Attorney
    George Price, Esquire

---

[1] We note that although both Defendant and his wife testi-
fied, neither mentioned any pre-existing dispute.

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA  :  No. 89-10,014
                              :
                              :
        vs.                   :  CRIMINAL
                              :
JAMES R. PRINCE,              :
            Defendant         :  PCRA

                        OPINION AND ORDER

                This matter came before the Court on

Defendant's Post Conviction Relief Act (PCRA) petition.  After

a review of the record, the Court finds that Defendant's

allegations are insufficient to warrant an evidentiary hearing

for the following reasons:

        1.  The Court believes that the issues raised in the

Petition have been waived.  Commonwealth v. Miller, 388

Pa.Super. 7, 564 A.2d 975, 977 (1989) ("Ineffectiveness of

trial counsel must raised at the first opportunity at which

counsel whose effectiveness is being challenged no longer

represents the defendant.").

        2.  The Court finds that the issues raised by the

Defendant would not entitle him to the relief requested.

The issues raised by Defendant can be grouped into two (2)

general categories: (1) credibility of the victim, Kathy

Rogers, and corroborating witness, Gregory Kessinger; and (2)

ineffective assistance of counsel for failure to file a

suppression motion with respect to two (2) knives.

        With regard to the credibility issues, we would

first note that credibility determinations are within sole

province of the trial of fact.  Commonwealth v. Ahearn, 543

Pa. 174 670 A.2d 133, 136 (1996).  Next, Defendant's

contentions regarding the witnesses intoxication and jury

instructions are not supported by the record.  There was

testimony introduced at trial that the victim and Mr.

Kessinger drank some alcoholic beverages on night in question.

However, there was no testimony that either individual was

intoxicated.  Both Officer Bowers and Mr. Kessinger testified

that they did not believe that the victim was intoxicated.  In

fact, the testimony adduced at trial would indicate that if

anyone were intoxicated on the evening in question, it was

Defendant.  Even assuming arguendo that either of these

individuals were intoxicated on the night in question, the

Court finds no error in the jury instructions.  Defendant

contends that counsel was ineffective for failing to request

jury instructions 4.07 and 4.17.  The Court gave Instruction

4.17 (see trial trans. pp. 374-375) and Instruction 4.07 does

not appear to be applicable to the facts of this case as no

factors were present which would render the accuracy of the

victim's identification doubtful. See sub-committee note to

Pa.SSJI (Crim) 4.07.  Additionally, Defendant did not claim

that he was not with the victim on the night in question.

Rather, he claimed that any advances made toward the victim

were consentual and it was only when Defendant refused to

continue the sexual encounter that the victim became upset and

threatened to allege a rape if Defendant did not continue.

2

With respect to the legality of the search for the knives and their introduction into evidence, the Court finds that the knives were relevant both to show that Defendant owned a knife that fit the victim's description of the knife used in the incident and to assess Defendant's credibility. We would also note that at the time of Defendant's trial the law provided that: (1) the police were not required to inform Defendant or his wife prior to the search that they had a right to refuse to permit the police to search home without a warrant, see Commonwealth v. Smagala, 383 Pa. Super 466, 557 A.2d 347, 350 (1989); and (2) Defendant's wife could give consent for the police to search their home; see Commonwealth v. Biebighauser, 450 Pa. 336, 344, 300 A.2d 70 (1973). Therefore, Defendant's assertions to the contrary are meritless. Finally, even if the knives should not have been introduced into evidence, the introduction of this evidence did not so undermine the truth determining process that no reliable adjudication of guilt or innocence could have taken place. The Court finds that even if the knives had not been entered into evidence, the Defendant would have been found guilty.

O R D E R

AND NOW, this 25th day of March 1997, upon review of record and pursuant to Pa.R.Crim.P. 1507(a), it is the finding of this Court that Defendant's Petition for Post Conviction Relief filed in the above-captioned matter raises no genuine issue of fact and Petitioner is not entitled to post conviction collateral relief. As no purpose would be served by conducting any further hearing, none will be scheduled and the parties are hereby notified this intention to deny the petition. Defendant may respond this proposed dismissal within ten (10) days. If no response is received within that time period, the Court will enter an order dismissing the petition.

By The Court,

_____
Kenneth D. Brown, J.

cc:  Henry Mitchell, Esquire
     Kenneth Osokow, Esquire (ADA)
     James Prince, BD-1801
       1100 Pike St.,
       Huntingdon, PA  16654-1112
     Law Clerk
     Judges
     Gary Weber, Esquire (Lycoming Reporter)

4

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA   :    No. 89-10,014
                                 :

     vs.                        :    CRIMINAL DIVISION
                                 :

JAMES R. PRINCE,          :
         Defendant       :    1925(a) Opinion

RECEIVED
SEP 4 1997
DISTRICT ATTORNEY

OPINION IN SUPPORT OF ORDER IN
COMPLIANCE WITH RULE 1925(a) OF
THE RULES OF APPELLATE PROCEDURE

     This opinion is written in support of this Court's
Order dated April 17, 1997, wherein the Court denied
Defendant's Post Conviction Relief Act (PCRA) petition without
an evidentiary hearing.  The Court gave brief explanation of
it reasons in its Opinion and Order dated March 25, 1997.
However, while this Opinion discussed the law, it did not
discuss the facts in detail.  Therefore, the Court will
endeavor to supplement its previous Opinion by giving more
factual detail and citation to the record.

     During trial, post verdict motions and sentence,
Defendant was represented by James Protasio.  On or about
November 30, 1989, the Court permitted Attorney Protasio to
withdraw and appointed the public defender William Miele to
represent Defendant.  Attorney Miele filed a motion to
reconsider Defendant's sentence which was denied by the Court.
Thereafter, Attorney Miele filed a Notice of Appeal.

     In his Concise Matters Complained of on Appeal,
Defendant relied upon his post verdict motions and motion for

EXHIBIT 4                              E-16

reconsideration of sentence and averred generally that trial counsel was ineffective. This statement was amended to include an claim of ineffectiveness for failing to request inspection of Wise Options for Women and mental health records pursuant to <u>Commonwealth v. Wilson</u>, 540 A.2d 1381 (1988). In our Opinion of April 24, 1990, in support of the previously issued orders, the Court explained its decision on Defendant's Post Verdict Motions and stated the following: "In his Post-Verdict Motions, Defendant also raises the claim of ineffectiveness of counsel. Beyond the blanket accusations, no specific example of effectiveness were cited. Moreover, we can find no indiction of effectiveness in the record, as the Defendant was ably and competently represented at trial."

The Pennsylvania Superior Court issued a memorandum decision of Defendant's appeal on or about September 20, 1990. Therein, the Superior Court noted "after the post verdict motions were denied and sentence was imposed, a timely motion for reconsideration of sentence was denied and trial counsel was permitted to withdraw so that Appellant could raise the ineffectiveness of counsel." The record before the Superior Court, however, was insufficient for that Court to determine whether counsel had a reasonable basis for the failure to inspect the records or whether the file of Wise Options contained material which would assisted Defendant in the presentation of a defense.

2

E-17

Thus, the Superior Court remanded the case to the trial court to conduct a hearing to resolve these issues.

The trial court conducted a hearing and in-camera review of the relevant records of Wise Options for Women and found that said records did not contain any material that would have served to assist the Defendant in the presentation of a defense and, therefore, trial counsel was not ineffective.

On or about January 8, 1991, Defendant, filed a pro se Notice of Appeal to the Court's November 26, 1990 Order. The Pennsylvania Superior Court quashed Defendant's appeal since it was untimely.

In July 1991, Christine Waltz, Esquire filed an Amended PCRA on Defendant's behalf asserting that Attorney Miele was ineffective for failing to timely file an appeal from the Court's November 26, 1990 Order and he was also ineffective in failing to raise the effectiveness of trial counsel who failed to cross-examine the alleged victim with prior statements and inconsistencies in her testimony, failed to present evidence to a pre-existing dispute between Defendant's wife and the victim thereby providing a motive for the victim to try to setup the Defendant and failing to object to the sentencing judge's comments regarding Defendant's religious beliefs.

3

E-18

On or about August 16, 1991, Ms. Waltz withdrew her appearance and George Price entered his appearance on behalf of James Prince.[1]

On or about January 13, 1992, the Court entered an Order on Defendant's Amended Motion for Post Conviction Relief, purporting to grant Defendant leave to file an Appeal Nunc Pro Tunc from the November 26, 1990 Order but denying the petition in all other respects. On or about April 9, 1992, Kenneth R. Gallen, Esquire entered an appearance for the Defendant. In May 1992, Defendant, filed another pro se Notice of Appeal to the Court's January 19, 1992. Therewith, he presented documentation to show that he did not receive that decision in a timely manner. In a decision filed January 8, 1993, the Superior Court remanded this case to the trial court for appointment of counsel, for appropriate notice to the Defendant of the January 1992 Order of Rule 1507(d) and for an appeal, if Prince so desired, of the November 26, 1990 Order.

On March 22, 1993, the Court appointed William Coury, Esquire to represent Defendant. In that same Order, the Court gave Defendant notice pursuant to Rule 1507(d). On April 22, 1993, Attorney Coury file a Notice of Appeal. The Pennsylvania Superior Court rendered a decision on this PCRA on or about June 7, 1994 and affirmed Defendant's conviction.

---

[1] It appears that Attorney Price had relatively little involvement with this case as the Defendant believed Mr. Price had a conflict of interest.

4

E-19

Defendant filed a pro se second PCRA petition pro se on or about June 11, 1996. After a conference with Defendant's new current counsel, Henry W. Mitchell, Esquire, the Court gave Attorney Mitchell an opportunity to amend Defendant's pro se petition. Attorney Mitchell filed such a petition on or about August 5, 1996. The following issues were raised by these petitions: (1) Trial counsel was ineffective for failing to file a Motion to Suppress two (2) knives as the knives had no relevance, were prejudicial, were not connected to any offenses charged and the victim gave varying descriptions of the knife allegedly used in the assault; (2) that the victim and her corroborating witness were not credible because both were intoxicated at the time of the alleged assault; (3) trial counsel was ineffective for failing to request jury instructions 4.07 and 4.17 regarding identification testimony and credibility of witnesses; and (4) trial counsel failed to challenged the illegal search of his apartment on the following grounds: Petitioner's wife was not given any Miranda warnings, Petitioner's wife was not informed that she a right to refuse to permit the police to search home without a warrant, Petitioner's wife only gave consent to search Petitioner's clothes, Petitioner's wife gave no consent to search her kitchen, her drawers or any property except clothing, Petitioner gave no consent to search, the search was coerced in light of the failure of the police to notify the Petitioner and/or his wife with their rights before searching

5

their home, and any consent given by Petitioner or his wife was unknowing and involuntary in coerce.

The Court denied Defendant's petition without an evidentiary hearing for numerous reasons.

First, this is Defendant's second PCRA petition. Both the case law and the comment to Rule 1507 provide that a second or subsequent petition should be summarily dismissed when the judge determines that the defendant has failed to make a strong prima facie showing that a miscarriage of justice may have occurred.  Pa.R.Crim.P. 1507, comment; Commonwealth v. Lawson, 519 Pa. 504, 549 A.2d 107 (1988). Defendant did not make such a showing so the Court summarily dismissed his petition.

The Court also found that the issues raised in the petition had been waived.  Trial counsel's ineffectiveness "must be raised at the first opportunity at which counsel whose effectiveness is being challenged no longer represents the defendant." Commonwealth v. Miller, 388 Pa.Super. 7, 564 A.2d 975, 977 (1989).  Here, Defendant has had numerous opportunities to raise trial counsel's ineffectiveness. Including Attorney Mitchell, Defendant has had six (6) different attorneys since his trial counsel withdrew.  In fact, the Superior Court stated in its September 1990 decision that trial counsel was permitted to withdraw so that Defendant could raise his ineffectiveness.  Although he had the opportunity to raise these issues at or before the time of his

6

E-21

direct appeal, Defendant failed to do so.  He also had an
opportunity to raise these issues in his first PCRA petition.
Again, he did not do so.

Finally, the Court examined the merits of
Defendant's allegations and found that none were sufficient to
warrant an evidentiary hearing.  Defendant claimed both the
victim and her corroborating witness were intoxicated at the
time of the alleged assault and neither one's credibility was
reliable.  See Amended Post Conviction Petition, paragraph
2(b).  This allegation simply is not supported by the record.
There was some testimony introduced at trial that the victim
and Mr. Kessinger drank some acholic beverages on the night in
question.  Mr. Kessinger testified that he was in the
Kiddlywink Tavern for approximately four and one-half to five
hours and had about six (6) beers throughout the evening.
N.T. at pp. 16, 29-30.  The victim, Kathy Rogers, testified
that earlier in the day she and three (3) friends shared a
twelve (12) pack.  N.T. at p. 76.  She stated she went to the
Kiddlywink to purchase cigarettes and may have had one or two
wine coolers.  N.T. at pp. 77-78.  No one testified that
either individual was intoxicated.  Both Officer Bowers and
Mr. Kessinger testified that they did not believe that the
victim was intoxicated.  See N.T. pp. 37, 148, 174.  In fact,
the testimony adduced at trial would indicate that if anyone
were intoxicated on the evening in question, it was Defendant.
Defendant's own testimony was that he drank a six (6) pack and

7

E-22

possibly a couple of his friend Kurt's beers and then went to
Charlie's house and played quarters and drank some more beer.
N.T. at pp. 233, 261-262 and 265.  However, Charles Eschbach
(Charlie) and his girlfriend, Stacy Schley both testified that
the Defendant was intoxicated.  Ms. Schley testified that the
Defendant was drinking and that he was intoxicated.  When
asked how she knew that, she stated that she could smell it,
the way he talked, slurring, and his eyes.  N.T. at p. 302.
Mr. Eschbach testified that the Defendant was getting pretty
well drunk.  N.T. at p. 310.  In fact, he asked Defendant to
ride along with him because he was pretty drunk and didn't
want him to drive.  N.T. at p. 311.  On cross-examination when
asked if he recalled telling the police he had fifteen to
twenty (15-20) beers that evening, the Defendant stated yeah I
told them that just so they would leave me alone.  N.T. at pp.
261-262.  Shortly thereafter he contradicted his statement and
said he didn't tell them he had fifteen to twenty (15-20)
beers, he said he had maybe twelve (12).  N.T. at p. 262.  In
rebuttal, Officer Keith Bowers testified that the Defendant
said he had at least fifteen to twenty (15-20) beers at
Kurt's.  N.T. at p. 323.  During the videotaped interview when
asked how much he had to drink that night, Defendant replied
"probably more than a case."  N.T. at p. 331.

Even assuming arguendo that the victim or Mr.
Kessinger was intoxicated on the night in question, the Court
finds no error in the jury instructions.  Contrary to

8

E-23

Defendant's allegations, the Court did in fact give standard instruction 4.17.  N.T. at pp. 374-375.  The Court finds that instruction 4.07 simply was not applicable to facts of this case.  The sub-committee note to that standard instruction states

> "The above instruction on identification
> should be given only when the identifying
> witness was not in a position which would
> permit him to observe clearly the person
> committing the crime, when the witness is
> not positive as to identity, when his
> positive statements as to identity are
> weakened by qualification, by failure to
> identify the defendant on one or more
> other occasions, or by a prior
> inconsistent identification or when his
> identification testimony otherwise appears
> to doubtful.  No instruction on
> identification of testimony should be
> given when the identification witness had
> a good opportunity for positive
> identification, he is positive in his
> identification, and his identification is
> not weakened by prior inconsistent
> identification or prior failure to
> identify but remains, even after cross-
> examination, positive and unqualified.  To
> give an instruction on identification
> under these circumstances would serve only
> to confuse the jury."

Here, identification was not an issue because the Defendant did not deny being with Ms. Rogers on the night in question. Instead, he claimed that any advances were consensual.  Even if identification were an issue, the victim did not waiver in her identification of the Defendant.  Also, the victim clearly picked Defendant out of the photo array prior to trial.  See N.T. at pp. 138-141.

9

E-24

With regard to the legality of the search for the knives and their introduction into evidence, we would rely upon our discussion in the May 25 Opinion and Order.

Even if the knives should not have introduced into evidence, the introduction of this evidence did not so undermine the truth determining process that no reliable adjudication of guilt or innocence could have taken place. The Court firmly believes Defendant would have been convicted whether the knives were introduced or not. Generally, Defendant's version of the incident in question did not comport with the physical evidence. Defendant claimed that the victim voluntarily entered his vehicle by walking around to the passenger side and that he never exited his vehicle. N.T. at pp. 234-236. The victim, on the other hand claimed that the Defendant stopped his car, got out, forced her into his to car on the driver's side and then threw into the passenger seat. N.T. at pp. 48-50. When the police officers examined the area in question, they found sneaker prints and smaller prints which appeared to be a women's shoe which stopped going down the alley. N.T. at pp. 178-180. Defendant was wearing a sneaker with a circle pattern consistent with the sneaker found near Ocean Bay and up in the cemetery. N.T. at pp. 279-281. This evidence was consistent with victim's version of the events and inconsistent with the Defendant's version.

10

E25

The Defendant also claimed that any sexual encounter with the victim was consensual and he did not ejaculate. The claims also were not support by the evidence. The parties stipulated that Agent Audry Linch, as serology and blood expert with the FBI would testify that semen was found in the victim's panties and the Defendant's underwear and that the semen was consistent with the blood type of the Defendant. N.T. at pp. 220-221. The punch to the face and other bruises and injuries to the victim, the bruises and scratches on Defendant's neck and back, and the victim's ripped clothing also were more consistent with the victim's testimony than the Defendant's. N.T. at pp. 69-71 (injuries to the victim); pp. 191, 272 and Commonwealth's Exhibits 22 through 24 (bruises and injuries of the Defendant); and pp. 54, 66, 126, and 128 through 129 (ripped clothing and zipper of jacket).

Defendant's conduct at or about the time of his arrest also evidenced consciousness of guilt. At the time of the incident a license plate (SAY 214) was on Defendant's vehicle. N.T. at p. 72. When the police found the vehicle which matched the victim's description, the plates had been removed. N.T. at pp. 130, 186, 208. The police ran a check of the vehicle identification number and discovered that the vehicle was registered to the Defendant, James Prince. When they went to the Defendant's residence and knocked on his door, Defendant himself initially came downstairs toward the door; however, when he realized it was the police he rapidly

11

proceeded back up the stairs and attempted to exit out the back until he heard that there were police there also. N.T. at pp. 135-137, 187-188, 203-206. When the police searched Defendant's residence, they found the license plate to Defendant's vehicle. N.T. at pp. 208-209.

Defendant also altered his appearance prior to the preliminary hearing. At the time of incident the Defendant had a beard, mustache and medium length hair. At the time of the preliminary hearing, he had shaved the beard and mustache and cut his hair. N.T. at pp. 74-75, 286-287. Defendant claimed that he had shaved because he was in mourning over his mother's death. This explanation simply did not ring true.

The above discussion sets forth a few of the examples of why the Court believes that the introduction of knives, assuming such was improper, would not have affected the truth determining process. When the transcript is read in its entirety, it is readily apparent that Defendant's advances were not consensual and that he was the perpetrator of this brutal crime.

E-27

For the foregoing reasons, the Court denied the
Defendant's second Post Conviction Relief Act Petition.

DATE: _Oct. 3 1997_                    By The Court,

                                       KDB
                                       ─────────────────────
                                       Kenneth D. Brown, J.

cc:  Kenneth Osokow, Esquire
     James Prince
       BD-1801
       1100 Pike St.
       Huntingdon, PA  16654-1112
     Law Clerk
     Court Reporter
     Superior Court (original & 1)
     Judges
     Gary Weber, Esquire (LYCOMING Reporter)
     Henry Mitchell, Esquire

13

E-28

52.

dant.

Q:  Now, Ms. Rogers, where did the car go after it then passed your garage?

A:   It went up Cemetery, up by Easy Market.

Q:  Did the car go in the cemetery area?

A:  Yes.

Q:  What were you doing while the Defendant was driving then?

A:  Trying to get out, he had the knife.  In fact, I thoug about pulling the steering wheel trying to cause an accident.

Q:  You indicated he had a knife, is that correct?

A:  Yes.

Q:  Where did he have the knife at?

A:  To my throat.

Q:  Do you remember, can you describe at all the knife?

A:  I didn't see the handle, but it was about that long.

Q:  You are talking about the blade?

A:  The blade.

By Mr. Osokow:

For the record, your Honor, the witness indicated about 6 -8  inches.

By The Court:

Okay, the record shall reflect that.

By Mr. Osokow:

Q:  How about the width of the knife?

A:  It was about like that.

Exhibit 5

By Mr. Osokow:

          And again, your Honor, the witness has indicated about 3 inches, two to three inches.

By The Court:

          Okay, the record shall reflect that.

By Mr. Osokow:

          Q:  Where did the car go when it went up into the cemetery area?

          A:  It just seemed he kept on driving.  No, I don't even know the whereabouts myself, just a dark road, there was no houses.  You know, I didn't see nothing.

          Q:  Did there come a time when the car stopped?

          A:  Yes.

          Q:  Did it stop on the roadway or did it pull off the roadway?

          A:  It pulled off the road.

          Q:  Do you know about how far off the roadway?

          A:  I don't recall.

          Q:  After the car pulled off the roadway what did the Defendant do at that time?

          A:  Ah, he, ah, wanted me to take off my clothes.

          Q:  Did he ask you to do that?

By Mr. Osokow:

          Again, your Honor, the witness is nodding yes.

          A:  Yes.

By Mr. Osokow:

          I don't know if Mr. Reese got that or not.

75.

Q: What type facial hair did he have?

A: Ah, a mustache and some hair here.

Q: A beard you are referring to?

A: Yes.

Q: What was the length of his hair the night of the incident?

A: It was shorter than mine, about down past his ears.

Q: Did there come a time when you went to the preliminary hearing at the Magistrate's in this case?

A: Yes.

Q: And was the Defendant at that hearing?

A: Yes, he was.

Q: Were you able to identify him at that hearing?

A: Yes, I was.

Q: Did he appear any different the night or the day of that hearing than he did the night of this incident?

A: Yes.

Q: How was he different?

A: His hair the night it happened it was curly and long, and his hair was cut, and he was clean and shaven when I saw him at the hearing.

Q: Now, I believe you also indicated that the knife the Defendant used the night of the incident was about 8 inches long, t he blade, is that correct?

A: Yes.

Q: I believe you also said you did not see the handle, is that correct?

76.

A:  No, I did not.

Q:  Ms. Rogers, I am going to show you a knife that is contained inside Exhibit 17, and ask you if this appears to be similar to the one the Defendant had that night?

A:  Yes, it is.

Q:  Thank you.

By Mr. Ooskow:

I would have nothing else, your Honor.

By The Court:

Cross examination.

CROSS EXAMINATION

By Mr. Protasio:

Q:  Ms. Rogers, I believe you indicated earlier the day of the incident you had been over to a friend's house?

A:  Yes, I was.

Q:  And approximately how long would you have been at the friend's house?

A:  For a  couple hours.

Q:  During that period of time you were there had you had anything to drink?

A:  Yes.

Q:  And what were you drinking?

A:  Beer.

Q:  Okay, do you have any idea how much you would have had to drink?

A:  There was four of us among a twelve pack.

81.

in an accident up in Cogan Station, and we are going for a ride, and do what I say and you won't get hurt.

Q: At that point in time did he have a knife in his hand?

A: Yes.

Q: Okay, so he had a knife in his hand when he first got out of the car?

A: I don't know, I just know it happened so fast. He grabbed me, my coat ripped, and before I knew it I was in the car.

Q: Is it fair to say the first time you would have saw the knife is when you were actually in the car?

A: I can't say yes to that or no, I don't recall.

Q: Okay, now, I believe you were shown a knife, and I don't recall whether I heard your answer, but I believe you were asked whether the knife blade, which is No. 17, was similar to the one that you saw that evening?

A: It was long, yes.

Q: Was it approximately like this?

A: Yes.

Q: Now, do you know for certain whether or not that is the same knife you saw that evening?

A: I don't really remember, I just remember telling the officers how long, and it was like a fishing knife, something that is used to take fish scales off.

Q: Did you specifically tell the officers it was ex number of inches long, ex number of inches wide, or did you

just describe it as being a fishing type knife?

A:  I just went like that there.

Q:  And then you indicated it was like a fishing knife?

A:  That is the way I described the knife, yes.

Q:  Now, I believe you indicated that the person then started to drive the car, and that he then also held the knife to your throat?

A:  At that point he, ah, he was driving before we knew it.  We was up by my apartment, and back behind the alley, and he said that we are going for a ride, and he was hurting my arm and pulling my hair and stuff.

Q:  Was he continually holding the knife to your throat during this entire period of time you were riding from the parking lot to the cemetery?

A:  I don't recall.

Q:  Had he done it for most of the time?

A:  I remember seeing the knife many times, I don't really recall, you know, I can't remember every minute, but I do remember him using the knife, yes.

Q:  Okay, do you recall what hand he had it in?

A:  Excuse me.

Q:  Do you recall which hand he was holding it in?

A:  No, I don't.

Q:  Did he drive around for a while or did he take you directly up to the cemetery area?

A:  Right directly up.

Officer Keith Bowers - Direct                                    143(1)

        A    That is correct.

        Q    And that would be for the purpose of comparison,
is that correct?

        A    Right, to transmit those to the lab where they
could be compared.

        Q    Now, I believe you indicated, you at City Hall
had spoken to the Defendant, is that correct?

        A    That is correct.

        Q    Did you speak to the Defendant concerning his
ownership of sort of knives?

        A    Yes, I did.

        Q    And, specifically, what sortt of knife did you
speak to him concerning owership of?
                                                        fishing?
        A    Okay, I asked him if he had a knife for hunting and/

        Q    Did he respond?

        A    Yes, he did.

        Q    And what did he tell you?

        A    Okay.  He stated that he did have such a knife,
and I asked him, you know, to describe it, and he stated it was
about this big.

        Q    Would that have been consistent with the description
Ms. Rogers had given?

        A    Yes, I recall specifically her description because
when she said it was this big, I said, do you know, thought that
or something she might be exaggerating on due to the trauma, and
when he said, this big, you know, it somewhat shocked me.

Exhibit 6

Q    Did you ask or did Mr. Prince indicate anything more concerning that particular knife?

A    Okay.  Yes, he did.  He stated that it was part of a pair knives and that the other one of the pair was already in the police custody.  He-- regarding the other knife, he had stated had been taken from under the driver's seat of his car previously.

Q    By the police at some other time?

A    Right, by the police.

Q    Did you, in fact, check the records at the police department to see if you had-- if the police had a knife that had been taken from the Defendant?

A    Yes, I did?

Q    And did you bring that with you to Court today?

A    Yes, I did.

Q    Officer Bowers, I'm going to show you what's been marked as Commonwealth Exhibit No. 20, and ask if you could identify that, please?

A    It would be the same knife, it has identical case number and Officer Goodbrod's signature on the card.

Q    And does that indicate on that card when the knife would have been obtained from the Defendant?

A    It is dated July 5, 1988.

Q    If you would, please, if you would compare that knife to the knife contained within Exhibit 17, Ms. Rogers had earlier described as being similar to the knife the Defendant

had on the night of this incident.  Please, how does it compare?

      A    Okay.  By appearance, the handles appear the same, the blades are different size, however, the writing on both sides of the blade are the same.  They both have three lines and then state precision hollow ground and the second line bond stainless steel.    There are three like slashes before that on both and on the other side both state manufactured in Japan, and there's headquarters, U.S.A.

      Q    And I believe you indicated the Defendant told you the knife he had was part of a set, is that correct?

      A    That's correct.

      MR. OSOKOW:  Thank you.  Your Honor, may I approach on one matter?

      THE COURT:  Yes.

      MR. OSOKOW:  Your Honor, at this time there would be a stipulation that Commonwealth's Exhibit No. 20 had been seized on July 15th by Officer Goodbrod as a result of a vehicle stop, discovered in a vehicle stop and the vehicle driven by the Defendant was Commonwealth's Exhibit No. 20.

      THE COURT:  Exhibit 20 is the knife?

      MR. OSOKOW:  Yes, Your Honor.

      THE COURT:  Before you go on, Mr. Osokow, Mr. Protasio, do you stipulate to that information?

      MR. PROTÁSIO:  Yes, Your Honor.

A    That is correct.

Q    And that would be for the purpose of comparison, is that correct?

A    Right, to transmit those to the lab where they could be compared.

Q    Now, I believe you indicated, you at City Hall had spoken to the Defendant, is that correct?

A    That is correct.

Q    Did you speak to the Defendant concerning his ownership of sort of knives?

A    Yes, I did.

Q    And, specifically, what sortt of knife did you speak to him concerning owership of?

A    Okay, I asked him if he had a knife for hunting and/ fishing?

Q    Did he respond?

A    Yes, he did.

Q    And what did he tell you?

A    Okay.  He stated that he did have such a knife, and I asked him, you know, to describe it, and he stated it was about this big.

Q    Would that have been consistent with the description Ms. Rogers had given?

A    Yes, I recall specifically her description because when she said it was this big, I said, do you know, thought that or something she might be exaggerating on due to the trauma, and when he said, this big, you know, it somewhat shocked me.

Exhibit 7

Officer Keith Bowers - Direct                                    143.

        Q    Did you ask or did Mr. Prince indicate anything

more concerning that particular knife?

        A    Okay.  Yes, he did.  He stated that it was part

of a pair knives and that the other one of the pair was already

in the police custody.  He-- regarding the other knife, he had

stated had been taken from under the driver's seat of his car

previously.

        Q    By the police at some other time?

        A    Right, by the police.

        Q    Did you, in fact, check the records at the police

department to see if you had-- if the police had a knife that had

been taken from the Defendant?

        A    Yes, I did.

        Q    And did you bring that with you to Court today?

        A    Yes, I did.

        Q    Officer Bowers, I'm going to show you what's been

marked as Commonwealth Exhibit No. 20, and ask if you could

identify that, please?

        A    It would be the same knife, it has identical case

number and Officer Goodbrod's signature on the card.

        Q    And does that indicate on that card when the knife

would have been obtained from the Defendant?

        A    It is dated July 15, 1988.

        Q    If you would, please, if you would compare that

knife to the knife contained within Exhibit 17, Ms. Rogers had

earlier described as being similar to the knife the Defendant

Officer Steven Sorage - Direct                                    201.

Q    And how long have you been so employed?

A    In excess of eight years.

Q    And, Mr. Sorage, I'd like to direct your attention
back to December 13, 1988, did you work that particular day or
morning?

A    Yes, I did.

Q    Do you recall what shift you would have been
working at that time?

A    I was working the 11 p.m. to 7 a.m. shift that
morning.

Q    And did there come a time that you were requested
to assist Officer Bowers in arresting an individual?

A    Yes, there was.

Q    And who was the individual you were to assist in
arrest?

A    James Prince.

Q    Where did you go when you were requested to
assist Officer Bowers?

A    1430½ Memorial Avenue.

Q    And did any other Officers accompany you to that
location?

A    Yes, Officer Goodbrod of the Williamsport Police
Department, Officer Dincher, Sergeant Jett, and I believe there
was one or two other officers.

Exhibit 8

Officer Steven Sorage - Direct

Q    Do you recall how many entrances to the residence there would have been?

A    Two.  A side entrance, 1438½ is actual a second floor apartment of that structure.  There was a side entrance that leads up into the second floor, and then there would have been a rear entrance.

Q    And where were you to go when you arrived at the residence?

A    To the side entrance which was actually the front.

Q    Did any other officers accompany you to that entrance?

A    Officer Dincher did, and I believe another Officer accompanied us to that entrance.

Q    Do you recall where the other officer went?

A    Sergeant Jett, Officer Goodbrod, and I believe they had a canine officer went to the rear of the structure.

Q    And for what purpose did they go to the rear?

A    In case Mr. Prince attempted to escape out the back door.

Q    Was Officer Bowers with you at that time?

A    Yes, he was.

Q    Do you recall, specifically where he would have gone?

A    I think he went to the front door with us, which is on the side.

Officer Steven Sorage - Direct

203

Q    What did you do when you arrived at the home?

A    We knocked on the front door.  The residence was dark, it was approximately 3:30 in the morning, and--

Q    Did there come a time when any came?

A    Yes.

Q    How long after you had been at the home or knocking, did someone come?

A    It was a very brief period of time, approximately a minute.

Q    And were you able to see the individual that came?

A    Yes.

Q    Where did that person go to?

A    Okay.  After knocking an interior light at the top of the steps came on, it would have been a hallway light, and I observed a white male come to the top of the steps. He was wearing a pair of pants, no shoes, no shirt, and I could that through a sheer curtain in the front door.

Q    Did that individual come down the steps?

A    Yes, he did.

Q    And where did he go at that time?

A    He pulled the curtain aside and looked out at me, I looked at Mr. Prince.

Q    Was the individual you observed the Defendant in this case?

Officer Steven Sorage - Direct

A    Yes, he was.

Q    What happened at that time?

A    I believe he asked who it was, I said, police officers, and he looked right at me, pulled the curtain aside and then he turned around and he ran back up into the residence.

Q    When you say, he ran back up into the residence, were you able to see him running at that time?

A    Yes.

Q    What did you do after he ran back into the residence?

A    At approximately the same time that he was going back up into the residence, his wife started down the steps and she came down to the front door.  I, again, identified myself as a police officer and asked her to let us in.

Q    Did she let you in at that time?

A    Yes, she did.

Q    What did you do after you entered the residence?

A    I asked her if James Prince lived there and she stated he did.

Q    Were you still down at the bottom portion of the steps at that time?

A    Yes, sir.

Q    Where did she go after she indicated the Defendant did live there?

A    I asked her to go get him and come to the front
door.

Q    What occurred at that time?

A    She went to the top of the steps and she looked
both to the left and the right to the top of the stairway, and
she stated she didn't know where he went, and at that point,
Officer Dincher and myself started up the steps and went to the
top of the steps to the hallway.

Q    As you went up the steps, or got to the hallway
area, did you hear any voices or anyone from outside the
residence?

A    Yes, I could hear someone yelling at the rear of
the residence.

Q    Were you able to tell who was yelling?

A    No.

Q    Were you able to make out what was being said?

A    No.

Q    The area where you heard the yelling coming from,
would that have been the area the other officers were stationed
at?

A    Yes.

Q    What happened after you heard the yelling?

A    When I heard the yelling, I started down the
hallway toward the rear of the residence.

Q    For what reason did you do that?

A    I believed at that time Mr. Prince had got out
and either approached or confronted the other officers or they
had confronted him, and they were attempting to take him into
custody.

Q    Did you leave the residence?

A    No, I just started down the hallway.

Q    What happened at that time?

A    Upon getting part way down the hallway and Mr.
Prince appeared in the hallway at the rear of the residence.

Q    Did you take any action with respect to Mr. Prince
the Defendant?

A    Yes, I did, I ordered him to get up against the
wall and keep his hands where I could see them.

Q    And did you, at that time, handcuff him?

A    Yes, he was.

Q    After he was cuffed, did he-- was he turned over
to any other officers?

A    Yes, he was turned over to Officer Dincher and
Officer Bowers.

Q    Did they leave the home with the Defendant at
that time?

A    Yes, they did.

Q    DId you remain at the home?

Officer Steven Sorage - Direct

A    Yes, I did.

Q    Had you been requested to do anything further at the home?

A    Yes, initially we were going to obtain some additional clothes for Mr. Prince and obtain a consent to search the residence for other articles of clothing and evidence.

Q    Did you do that?

A    Yes.

Q    And were any articles-- did you attempt to ascertain-- strike that.  Did you attempt to determine what clothing Mr. Prince had been wearing on the morning of the 11th of December?

A    Yes, I did.

Q    And did you obtain those articles or clothing?

A    Yes, I believe so.

Q    I'm sorry.

A    Yes, I believe so.

Q    Do you recall what you would have obtained from the residence?

A    We obtained a brown suede jacket, a pair of long underwear, another pair of short brief underwear, several  blue shirts and a pair of faded blue jeans.

Q    I'm going to show you what's been marked as Commonwealth's Exhibit No. 15, and ask if you could identify that, please?

Steven Sorage - Direct                                            208.

        A    Yes, this appears to be the brown suede jacket
we recovered from the Prince residence.

        Q    I believe you indicated you obtained several blue
shirts, is that correct?

        A    Yes, sir.

        Q    I'm going to show you what's been marked as
Commonwealth's Exhibit 27, and ask if you could identify that,
please?

        A    Yes, this appears to be one of the blue shirts
we recovered from the Defendant's residence.

        Q    After obtaining the clothing from the home, what
did you do at that time?

        A    We turned the clothing along with a license plate
over to Officer Bowers of the Williamsport Police Department.

        Q    Now, you refer to a license plate, were you also
looking for a license plate?

        A    Yes, sir.

        Q    Were you able to locate a license plate?

        A    Yes.

        Q    I'm going to show you what's been marked, after
I show it to Mr. Protasio.  I'm going to show what has been
marked as Commonwealth's Exhibit No. 28, and ask if you could
identify what that would be?

        A    This would be a Pennsylvania registration plate,
SAY-214, and that would be the plate that we recovered from the

WP-21

I, X *Rona L Prince* _____, having been
informed of my constitutional right not to have a search made of the
premises hereinafter mentioned without a search warrant and of my
right to refuse to consent to such a search, hereby authorize
*P.O. SORAGE &* _____, and
*P.O. GOODBROD* _____, members of the
Bureau of Police of the City of Williamsport, Pennsylvania, to conduct
a complete search of my residence located at *1438½ MEMORIAL
AVE. WMSPT PA. 17701* _____.
These police officers are authorized by me to take from my residence any
letters, papers, materials or other property which they may desire.

This written permission is being given by me to the above named
Police Officers voluntarily and without threats or promises of any kind.

(SIGNED) X *Rona L Prince*
*1273-85-0434*

WITNESSES: *P.O. Randy L Goodbrod*

*P.O. Stephen J. Sorage*

A    Yes, it would have been on December 12th.

Q    How-- where did you see Ms. Rogers at?

A    At City Hall.

Q    How long a period of time where you in Ms. Rogers's
presence?

A    Probably twenty to thirty minutes.

Q    And were you able to construct a face from the
identi-kit you referred to?

A    Yes.

Q    What is done with the actual face or composite
after you construct it?

A    After it is put together it is completed then
it's just placed on a photocopies and copies made.

Q    I'm going to show you what has been marked as
Commonwealth's Exhibit 16, and ask if you could identify that,
please?

A    Yes, this is a copy of the composite and the
report I completed.

Q    And, again, this would be constructed from
different types of noses, lips, and things like that, is that
correct?

A    Yes, that is correct.

Q    Now, Agent Croft, I would like to direct your
attention to December 19, 1988.  Where you requested to do
anything in regards to this investigation on that day?

Exhibit 10

Agent Thomas Croft - Direct                          214.

A    Yes, I was.

Q    And what were you requested to do?

A    To go to the Prince residence on Memorial Avenue and try to obtain a knife that possibly was there.

Q    And did you go to the residence?

A    Yes, I did.

Q    And were you able to obtain a knife?

A    Yes, I did.

Q    Could you describe the knife that you obtained?

A    Probably the only way I can describe would be a large kitchen knife.

Q    Was it in the kitchen area when you obtained it?

A    Yes, it was.

Q    And where in the kitchen area, if you redall?

A    As I recall, it was in a drawer in the kitchen.

Q    Agent Croft, I'm going to show you what's been marked as Commonwealth's Exhibit No. 17, and ask if you cold identify that, please?  In contents, what has been marked as Exhibit 17.

A    Yeah, this is an envelope and inside the envelope is the knife that I recovered that day.

Q    And would your writing appear on the evidence envelope?

A    Yes, on the envelope, yes.

At the request of ADA Kenneth Osokow, I made contact with Rona Prince at 1438½ Memorial Avenue. Also present were Officer Duck and Officer Peacock. Contact was made on 19 December 1988 at about 1300 hours. We told her we were looking for a large hunting or fishing knife. She signed a consent search form which is attached.

She gave us the only large knife in the house, according to her. It was in the kitchen area in between some sheets. This was to keep it away from the girls who are 7 and 8 years old. It is a kitchen knife and Prince said there was another like it, that was confiscated by the police several months ago. It was under the seat of their car.

There is no further information at this time. Knife was recorded on a property card and turned into Central Records with Officer Kempf.

02064

| 2. REPORTING OFFICER | | 3. BADGE | 4. DATE | 5. SUPERVISOR | | 6. DATE |
|---|---|---|---|---|---|---|
| Agt. Thomas J. Croft | | A2 | 12/19/88 | | | 12/19/88 |
| 7. CASE STATUS ☐COMPLETED ☐ACTIVE ☐ARREST CLEARED ☐UNFOUNDED ☐INACTIVE ☐EXCEPTIONALLY CLEARED | | 8. OFFICER ACTION 161 | | 9. REVIEWED BY BA | 10. DATE 12-20-88 | 11. PAGE 1 OF 1 |

Exhibit 11

16.

Q: How long did you stay at the Kiddly Wink Bar?

A: Four and a half, five hours.

Q: What time approximately did you leave the Kiddly Wink?

A: Approximately 2:00 o'clock.

Q: I believe you indicated after leaving the Kiddly Wink you went out for coffee and donuts?

A: Yes, we did.

Q: Did there come a time that you dropped Denise off at home?

A: Yeah, after we had coffee and donuts I had noticed the roads were getting rather bad, it was snowing that evening, and after talking, I said look, I will take you home, and then I will go find a motel room. So I dropped her off on Memorial Avenue approximately 3:45 — 4:00 o'clock.

Q: Now, after you dropped her off what did you do?

A: We talked for a few minutes and I made sure she got in the house, and then I proceeded down Memorial Avenue toward Lycoming Creek, and I proceeded to take a righthand turn on Cemetery at the Convenient Store.

Q: Was there any reason you were turning there at that time?

A: I was trying to kill time until the motel, I would get the full twenty-four hours. I was going to check in about 6:30 — 7:00 o'clock in the morning.

Q: Now, where did you go after turning up Cemetery Road at the Easy Market?

Exhibit 12

29.

was back on the night or early morning of December 11?

A: Well, yeah, on that night there was full growth of somewhat of a beard and mustache. At the preliminary hearing there was no facial hair at all, and his hair had been cut, and then today he has growing a mustache.

By Mr. Osokow:

Thank you, nothing else, your Honor.

By The Court:

Cross examination.

CROSS EXAMINATION

By Mr. Protasio:

Q: Mr. Kessinger I believe you indicated you had been at the Kiddly Wink Bar?

A: Yes, I had.

Q: And you were there for, was it four and a half – five hours somewhere around there?

A: A couple, three and a half, four hours, yes.

Q: Okay, do you know approximately what time you would have arrived?

A: Ah, we were shooting pool earlier on in the evening. I would say about 8:30 – 9:00.

Q: Were you a frequent patron of the bar there?

A: I had known the previous owner of the Kiddly Wink and I had shot pool on that pool team many years ago, so I stopped in to see if I could run into any of my old friends, yes.

Q: Do you recall seeing the victim in this case, Kathy

Rogers there that evening?

A: No, I didn't. I was in the back of the bar where the pool tables are located, and I was with a group of people, so I was pretty much, my activity was contained to a couple tables to the very back of the bar.

Q: During this period of time you were there were you drinking?

A: I had occasion to purchase a beer, yes.

Q: Okay, well, you say a beer. Did you have more than one beer or just one?

A: I would say I had about six beers throughout that evening, yes.

Q: Now, I believe you indicated you would have left around the time of closing, which would have been around 2:00 o'clock?

A: 1:30 - 2:00, yes. At last call.

Q: Do you know if there were still other people in the bar after 2:00 o'clock then finishing up their drinks or whatever?

A: Ah, there were a few patrons still having their last call, yes.

Q: Okay, do you recall whether you saw Kathy Rogers at that point in time?

A: No, I hadn't taken notice, no.

Q: Did you see James Prince in the bar at all that evening?

A: No, I hadn't.

Q: Had you ever seen James Prince before that evening?

Q:  Did Kathy Rogers appear to be drinking that evening?

A:  No.

Q:  Did you detect any odor of alcohol on her?

A:  No.  Not anything out of the ordinary, no.

Q:  Were you present when she would have called the police?

A:  No.

Q:  Was there any discussion about taking her to the hospital that evening immediately as opposed to taking her home?

A:  I told her if she needed to have medical attention immediately, yes.

Q:  Did she ask you to take her to the hospital?

A:  She asked me to take her to her home, to her boyfriend.

By Mr. Protasio:

I would have no further questions.

By The Court:

Any re-direct?

By Mr. Osokow:

RE-DIRECT EXAMINATION

Q:  Mr. Keissinger, you indicated to Mr. Protasio that you requested the District Attorney's Office if you needed it to speak to your Probation Officer, is that correct?

A:  Yes, I did.

Q:  Did you need anyone from  the  District Attorney's Office?

A:  No, I didn't.

76.

A:  No, I did not.

Q:  Ms. Rogers, I am going to show you a knife that is contained inside Exhibit 17, and ask you if this appears to be similar to the one the Defendant had that night?

A:  Yes, it is.

Q:  Thank you.

By Mr. Ooskow:

I would have nothing else, your Honor.

By The Court:

Cross examination.

## CROSS EXAMINATION

By Mr. Protasio:

Q:  Ms. Rogers, I believe you indicated earlier the day of the incident you had been over to a friend's house?

A:  Yes, I was.

Q:  And approximately how long would you have been at the friend's house?

A:  For a couple hours.

Q:  During that period of time you were there had you had anything to drink?

A:  Yes.

Q:  And what were you drinking?

A:  Beer.

Q:  Okay, do you have any idea how much you would have had to drink?

A:  There was four of us among a twelve pack.

77.

Q:  I believe that you then indicated your friend had given you and your husband, your boyfriend and your child a ride home?

A:  Yes, I did.

Q:  Do you know approximately what time you would have gotten home?

A:  Close to a little after twelve I believe, I really don't recall.

Q:  Earlier in the day before you had gone to your friend's house had you stayed at home or had you been somewhere else?

A:  I was at home.

Q:  Now, I believe you indicated that Mr. Shaheen was going to bed and you stayed up but were going to go get some cigarettes for both you and himself?

A:  Yes.  He knew I was going to get cigarettes, yes.

Q:  Had he gone to bed when you left?

A:  I believe, yes, he had to get up at 5:00, he was pretty well tired.

Q:  Would it have been around midnight or 12:30 when you would have left the house to go to the bar?

A:  I don't recall.

Q:  How long were you at the bar?

A:  Long enough to purchase cigarettes, and like I stated before I may have had one wine cooler.

Q:  Did you stay there for approximately an hour and a half?

78.

A:  I don't recall, I could have.  I don't recall.

Q:  Do you recall telling the police officer you had stayed there for an hour and a half at the bar?

A:  I stated I might have been, yes.

Q:  So is it possible you might have been there longer?

A:  Probably, I don't know to be exact.

Q:  Do you recall telling the officer that you had drank a couple of wine coolers?

A:  Yes, I do.

Q:  And is it possible you could have drank more than a couple?

A:  I, like I said, I had one.  It could have been.

Q:  Were there some friends of yours that were in the bar that evening?

A:  No.

Q:  Were you there by yourself then, you didn't sit with someone else or talk with someone else?

A:  I was there by myself.  I went there and I left alone.

Q:  Did you talk to anyone who was there?

A:  The bartender.  I just went in, you know, and sat down.

Q:  Now, did you indicate to the officer that you believe perhaps the person who assaulted you had been in the bar earlier that evening?

A:  No, no, I did not.  I never seen the Defendant before until we had the garage sale, and that is when he and his wife purchased

Officer Keith Bowers - Cross                                    148.

A   Yeah, yes, again, I tried to establish a time frame. I asked her what time she would have been on her way home, and she stated that it was approximately 2:00 o'clock in the morning.

Q   Okay, so she would have been at the Kiddlywink for approximately an hour and a half according to her statements?

A   That is correct.

Q   Did she indicate what her purpose was in going to the Kiddlywink?

A   I didn't note at that time if she did, no.

Q   Did she indicate to you she had been there drinking?

A   Yes, she stated she drank wine coolers.

Q   Do you recall whether she gave an indication as to how much she had to drink?

A   Ah, I-- I, don't specifically recall. She did for some reason it sticks in my mind, she said like there were two and she drank one and a portion, but I couldn't be sure if she said that night.

Q   All right. Now, did she ever indicate to you during any of these interviews that she thought she saw the perpetrator inside the bar, or he may have been inside the bar?

A   No.

Q   Now, I believe you indicated at some point -- in time you would have gone up to the Cemetery area had it would

Officer Keith Bowers - Recross                              174.
                    Redirect

while there staying for about one and a half hours. Did you
specifically ask her if she was there for about one and a half
hours or was that your calculation based on what she said, or was
there any further discussion concerning the approximate amount of
time she was there?

        A    Gay.  I think that was like a response to a
specific questions to how long and what time she would have been
going home.  That was, you know, I didn't go over the same
material again regarding the time frame.  When I received a
response I moved on.

        Q    Did you specifically recall asking her if she
remembered the bar closing or how she remembered what time she
left or anything of that nature?

        A    No, I did not.

        MR. PROTASIO:  I would have no further questions.

                    REDIRECT EXAMINATION

BY MR. OSOKOW:

        Q    When you came in contact with Ms. Rogers were
you able to determine, other than through her own statements,
whether she had been drinking?

        A    Okay.  Had she not told me she was drinking, I
didn't note anything that indicated to me that she was.

        MR. OSOKOW:  Thank you, nothing else, Your Honor.

        MR. PROTASIO:  I'd have no further questions.

James Prince - Direct

233.

A    Yes, I know Kurt very well, I use to work with him.

Q    What's Kurt's last name?  In relationship to the date of this incident, when was that visit to Kurt's?

A    It was somewhere in the first week of December because I know tags, registration and insurance were all gone on the car.

Q    Okay.  Would it have been before the incident?

A    Oh, yes.

Q    Approximately how much before the incident?

A    A week, maybe a little more.

Q    Directing your attention to the night of the incident, where had you been earlier in the evening?

A    I was at Kurt's house originally that night.

Q    Okay, and what were you doing there?

A    Him and I had some beer.

Q    Had you been drinking?

A    Yeah. I brought a six-pack from home with me.

Q    How long did you stay at his house?

A    I got there about 8:30 and I left a little after 11.

Q    And where did you go after that?

A    I went to Charlie's house.

Q    And who is Charlie?

James Prince - Cross                                              261.

     A   Right about eight-thirty.

     Q   When you got to his residence, was your purpose
in going there to party with Kurt?

     A   Well, we were going to watch, well, I had rented
some movies from my VCR Club, and I gone out there, we were
going to drink a couple beers and watch a couple movies, but I
forget the movies at home.

     Q   So you and Kurt started drinking, is that correct?

     A   Yeah, we had a few beers.

     Q   Was there anybody else there?

     A   No, his mother was at work.

     Q   When you say a few beers, it's more than just
a few, isn't that true?

     A   I drank my six-pack.

     Q   Did you indicate to the police was that all you
had to drink there?

     A   I might have drank one or two of his, he had a
couple extra.

     Q   Did you have anything other than beer?

     A   No.

     Q   Do you recall telling the police that you had
drank and ale?

     A   Yeah, well, ale is beer.

     Q   Do you recall telling the police you had about
fifteen to twenty?

James Prince - Cross

A    Yeah, I told them that just so they'd leave me alone, that way--

Q    Okay, but that wasn't the truth what you told the police?

A    No, it was not.

Q    So when you seen fit or/ ^felt it would help you, you had no difficulty in telling something that is not true, is that correct?

A    No, I just didn't want them to bother me any longer, I was pretty aggrivated. They acted like they were going to work with me, then they tried to, like, well, we don't care really about you, so I wanted/ ^just to get them to leave me alone.

Q    SO telling them you had fifteen to twenty to drink was not the truth, correct?

A    Well, I didn't tell them I had fifteen or twenty anyway. I said I had maybe twelve.

Q    In any event, you told them you had twelve or six, isn't that true?

A    Yes, but --

Q    But that wasn't true, is what you're saying now?

A    No, I had six of my own and one or two of his.

Q    Was Kurt ^awake when you left?

A    Yes. He was kind of, he was like a tired man calling it a night, and I said all right.

James Prince - Cross

Q    What did you do when you got down to his home?

A    We played a game called quarters.

Q    Well, could you explain how this game works?

A    You take a quarter, you shoot it toward a cup, if you make it you pick somebody to drink a beer.

Q    And did you have to drink beers as a result of that game?

A    Yeah, everybody had to drink beers as a result of that game.

Q    Do you recall how long you were at Mr. Eschbach's home or this Charlie's home?

A    Oh, two, two and a half hours.

Q    And when you would have to drink the beer would you just have to sip it?

A    You drink it.

Q    Drink it right down?

A    About as much water is left in this cup, about that much, a little more than a shot, just shoot it down.

Q    So you wouldn't be sipping it, correct?

A    You wouldn't be drinking very much, no, it was just like a swallow.

Q    Now, did you tell the police what you did after you left Mr. Eschbach's home?

A    No.

Stacy Schley – Direct                                            302.

Q    When the Defendant came to your home, could you
describe his condition?

A    He was drinking.

Q    Do you know if he was intoxicated or under the
influence?

A    Yeah.

Q    How were you able to determine that?

A    He—well, I could smell it and the way he talked,
slurring and his eyes—

Q    How was his walking?

A    I don't really remember, he come in through the
kitchen door and sat down.

Q    But he did appear intoxicated?

A    Yeah.

Q    When he came to your home, did he bring anything
with him?

A    He brung beer with him.

Q    While he was at your residence was anything drank,
did he drink any?

A    Yes.

Q    Are you familiar with a game called quarters?

A    Yes.

Q    Do you know if that was played that evening?

A    We played, you know, but I don't remember playing
quarters, we played that a lot of times.

Charles Eschbach - Direct                                    310.

A    Yes.

Q    And where does she live?

A    She was staying down at Muncy at her uncles at
the time.

Q    Now, when you returned from four-wheeling, did
you see Mr. Prince?

A    Ah, yes.

Q    Had he been there when you had left?

A    No.

Q    Could you describe his condition when you saw him
at that time?

A    He was drinking, and I would say was getting pretty
well drunk.

Q    Could you describe to the Jury why you believe
that?

A    After I came home we were playing Uno. When he
starts getting drunk he starts to get loud, he talks louder.
When he'd say uno, when he got down to a card, he'd smack the
table, or when he laid the card down.

Q    Based on your observations of the Defendant, and
your knowledge, believe he was getting intoxicated, is that
correct?

A    Yeah.

Q    How long did you stay at the home?

A    Ah, I don't know exactly.

Carles Eschbach - Direct                                        311.

Q    Did you leave the home again that evening?

A    Yeah.

Q    And for what purpose did you leave?

A    Took Wanda Leibhart down to Muncy.

Q    Did anyone accompany you?

A    Yeah, James did and another friend of mine, Mike
Houser.

Q    Was there any reason the Defendant went along?

A    I asked him to ride along because he was pretty
drunk and I didn't want him to drive home.

Q    Did you tell him that at that time?

A    No, I told him when I came home, I said, I told
him he could sleep on our couch and he said, no.

Q    Excuse me, I will get to that in
a minute if we could, but you indicated you wanted him to go
along because you didn't want him to leave because of his
condition, is that correct?

A    Yeah, right.

Q    Now, did you and he go to Muncy with Ms. Leibhart?

A    Yes.

Q    And did you return to the Williamsport area?

A    Yes.

Q    On the way back did anything unusual occur?

A    He got sick along the road.

Officer Keith Bowers -- Direct                                    323.

A   Yes, he did.  Initially he related going to Mr.
Dangle's in Cogan Station and drinking there and he said he had
at least fifteen to twenty there, and that Kurt passed out and
therefore he had left.  And then initially that is all he could
remember.

Q   Did he indicate he recalled where he went after
Mr. Dangles?

A   Okay.  Initially, no.  I started back at the
beginning again with him going to Mr. Dangles, and then when we
went back through it again then he stated he vaguely recalled
going to Charlie's house and provided information so we could
find Charlie's house to talk to the people there.

Q   Now, was he able to furnish you a time that he
left Mr. Eschbach-- Charlie would be Mr. Eschbach, is that
correct?

A   Yes.

Q   Was he able to furnish you a time that he left
Mr. Eschbach's home?

A   No, he didn't.

Q   Did he indicate to you what time he arrived home?

A   He stated the only reason he knew he arrived home
was because his wife had told him it was 4:00 o'clock in the
morning.

Q   Did he indicate he went home from Mr. Eschbach's
home?

Officer Keith Bowers - Direct                              331.

Q    Do you have any idea how much alcohol you consumed during the night, counting while you were at Kurts and while you were at Charlies?

A    Probably more than a case.

Q    How much is in a case?

A    I don't know.  I know at Kurts I drank more than twelve packs and probably drank   a case there.  And whatever I drank at Charlies place about fifteen at Kurts I guess.

Q    Do you know why we're asking all these questions?

A    Yeah, I guess I'm being accused of--

Q    Do you know what you're being accused of?

A    He told me.

Q    What did I tell you you're being accused of?

A    Picking somebody on-- well, that's the day he's supposedly raped her.

Q    I note you're shaking your head, you do not think you're capable of doing this thing?

A    No, I don't.

Q    But you don't recall the evening, last Saturday evening, early morning hours of Sunday morning?

A    No response.

Q    You say you drove your car home from Kurt's house to Charlie's house?

A    Yeah.

**JAMES PRINCE**, having been called
as a witness, having first been duly sworn according to law, was
examined and testified as follows:

### DIRECT EXAMINATION

BY MR. PROTASIO:

    Q    Would you give your name, please?

    A    James Prince.

    Q    Mr. Prince, directing your attention back to
December of last year, did you own a vehicle?

    A    Yes.

    Q    What type vehicle was it?

    A    It was a Ford Escort GL.

    MR. PROTASIO:  I don't know if anybody has a problem
hearing you, maybe you may move forward a little bit.

    THE WITNESS:  I can lean forward.

BY MR. PROTASIO:

    Q    Is that the only vehicle you owned at the time?

    A    Yes.

    Q    Did you ever have a knife in the vehicle?

    A    Yes, at one time, I did.

    Q    Okay.  Now, is there a time period when you took
the knife out of the vehicle?

    A    When I went hunting, yes.

    Q    Back in December, did you have the knife in the
vehicle at that point in time?

Exhibit 13

James Prince - Direct                                                232.

A     I no longer owned the knife at that time.

Q     What knife did you have in the vehicle?

A     I had no knife at all in the vehicle.

Q     When y ou use to have a knife in the vehicle, what type knife was it?

A     I had/black handle like, almost like a filet knife because it had curved blade, but it's more like a steak knife but I used it for fileting fish because it's good, it worked good.

Q     Black handled knife?

A     Yeah.

Q     Go ahead.

A     It had a little blade guide where your finger doesn't slide down and go under the blade and it had a curved handle where it fits you hand.

Q     Was it similar to any of the knives that have been shown here in Court today?

A     Not at all.

Q     Did you routinely carry any of those knives in your vehicle?

A     At one time, I carried one, but the police took that out of my car because it was sitting on the floor board.

Q     Now, your step-daughter, Tanya Miller, had referred to a time period when you had gone, you and the family, had gone to a friend's house named Kurt, do you remember who Kurt is?

James Prince - Direct

233.

A   Yes, I know Kurt very well, I use to work with him.

Q   What's Kurt's last name?  In relationship to the date of this incident, when was that visit to Kurt's?

A   It was somewhere in the first week of December because I know tags, registration and insurance were all gone on the car.

Q   Okay.  Would it have been before the incident?

A   Oh, yes.

Q   Approximately how much before the incident?

A   A week, maybe a little more.

Q   Directing your attention to the night of the incident, where had you been earlier in the evening?

A   I was at Kurt's house originally that night.

Q   Okay, and what were you doing there?

A   Him and I had some beer.

Q   Had you been drinking?

A   Yeah. I brought a six-pack from home with me.

Q   How long did you stay at his house?

A   I got there about 8:30 and I left a little after 11.

Q   And where did you go after that?

A   I went to Charlie's house.

Q   And who is Charlie?

James Prince - Direct                                                    234.

A    He's somebody I've known since I've been in
Pennsylvania.  He's a friend of my nephews, I meet him through
my nephew.

Q    And how long did you stay there?

A    I stayed from about midnight until a little after
2.

Q    And what did you do while you were there?

A    We played quarters and drank some beer.

Q    Okay.  So you continued to do some drinking while
you were there?

A    Uh-huh.

Q    Where did you go after you left Charlie's house?

A    I went home, but I took the back roads through
town because I was afraid I was going to get pulled over because
I had been in an accident earlier, so it took me quite a while
and I came to the church parking lot, it was nice and slick so
I started doing some donuts, then I almost had another wreck so
I went back to the larger parking lot, then I paused there for
a little while and started thinking about how I'm going to
explain to my wife I wrecked the car again especially with no
insurance and I hit another car in the process.

Q    So you were parked in this other parking lot for
a while?

A    Yeah, did one donut when I came into the parking
lot and I was just sitting there and I was listening to the

music and I was contemplating what I was going to say because I
knew she was going to explode.  I mean, it's bad enought" wrecked
the car once, but--

Q  Did anything happen while you were sitting there?

A  Yes, a lady come walking down the alley from the
way of the Kiddlywink.

Q  Did you know who she was?

A  No, but she kind of looked familiar, but I didn't
know who she was.

Q  What happened when she appeared in the vicinity of
your car?

A  I rolled down the window, and I said would you
like a ride home, and, well, I didn't say actually ride home, I
said, would you like a ride, she goes no, that's all right, I can
walk.  I said, well, the heats on, it's pretty cold out there,
because it had been snowing, it was about 10° degrees that night,
I know it was bitter cold.  She said, all right, so she walked
around to the car and got in the passenger's side.

Q  Did you force her in the vehicle?

A  No.

Q  Did you get out of the vehicle to in any way grab
her or threaten her?

A  Not at all.

Q  Where did you go after she got in the car?

James Prince - Direct                                                      236.

A    We didn't go anywhere right away.

Q    What did you do while you were in the car?

A    Well, she had an orange Sun Country Wine Cooler
in her hand, and I said, do you mind if I have a sip of that,
and she said, sure, so she let me have a sip of it, and said my
name is James, she said, hi, my name is Cathy, and then I handed
her back the wine cooler and she started drinking off some of it
and she looked me, she goes, you got a girlfriend and my hands
are on the steering wheel so I think my wedding band was pretty
visible, and I laughed and I said, no, I don't have a girlfriend.
And I said, it was quite late at the time when I saw her, I said
what are you doing out this late night, and, ah, she, I'm not
quite sure of the answer she gave me, she kind of just shook it
off.

Q    How long did you sit there in the parking lot with
her?

A    I guess we talked small talk back and forth.  I
explained to her I had the accident and everything.  I didn't
tell the details of it, I just said I was in a pretty bad wreck
that night.  I'd say between five, six minutes, somewhere in
there.

Q    Did she ask to get out of the car, did she make
any efforts to get out of the car?

A    None at all.

James Prince - Direct                                                    237.

Q    Did you attempt to stop her from leaving the car?

A    Not at all, no.

Q    After you talked to her for five or six minutes, what happened then?

A    Well, I asked her, I said, where do you live, I'll give you a ride home, and she says, no, that's all right, I can walk, and, well, my instincts said, there's something wrong, but, ah, since I was kind of depressed and I wanted somebody to talk to at the time, figure out what I was going to say to my wife, I said would you mind taking a ride around. She goes, no, that's fine, so we  preoceeded to drive. I started the car, well, it was already running, I threw it up in gear and started driving.

Q    Where did you go?

A    I drove out of the parking lot, through the church parking lot and onto Memorial Avenue and made a right turn there, which would take me up to the corner of Cemetery, then at the corner of Cemetery Imade a left turn and there was free conversation going on about what was on the radio. I asked her do you like rock and roll, she goes, yeah, I like rock and roll, this and that, and she goes I can't believe you're so good looking and you don't have a girlfriend, I kind of laughed at that. And, ah, I drove from the corner where I made the turn off of Memorial onto Cemetery up to High Street where I made a left turn which took me toward the Ezi-Mart. At the Exi-Mart I turned right up onto what I guess what they call Wildwood

James Prince - Direct                                            238.

Boulevard or Cemetery, I'm not sure what it is.  And she got
quiet, well, she had gotten quiet since the remark about how
good looking I was, and I was driving up the hill.  I went over
top past the cemetery and she kept staring at me the whole time,
so I saw the pull off so I stopped the car and she goes why are
you stopping, I said, you keep staring at me, and I need a drink
of that wine cooler, too.  So I drank the rest of the wine cooler
when she handed it to me, and I leaned over and I kind of pecked
her on the lips, a little kiss and I pulled back, I don't know
why I did it.  I wasn't even thinking, she didn't say anything,
she kind of smiled at that, so I leaned over and I kissed her
again and this time she responded in a positive way.

          Q   During this period of time, had she ever asked you
to stop and let her out?

          A   No, not at all.

          Q   Did you ever threaten her in any way?

          A   No.

          Q   Had you pulled out a knife on her?

          A   I didn't have a knife.

          Q   How long did it take you to get from the parking
lot area to the place where you pulled over?

          A   Well, with the road conditions, they were really
bad, it was like maybe a half inch snow, it was slippery.  I
would say it took us four minutes, that is top end.

James Prince - Direct                                                    239.

Q    During this period of time, did you keep the car in one gear or did you shift gears?

A    No, you constantly got to shift a five speed.

Q    Okay.  Now, you indicated it was slippery out, had you been out walking in the snow at all that evening?

A    When I was at Kurt's house we had to feed the dogs and stack some wood for the fire, and it was very slippery out that night.

Q    Was it slippery walking?

A    Yes, it was bad.  It was like the snow was like little fine pieces of ice is what it was that night because I remember when I left the house it was snowing then, and it had quit by the time I left Kurt's house.

Q    Now, you indicated you had pulled over and you had kissed her twice, what happened after that?

A    Well, one thing lead to another and I hadn't started, you know, fumbling around, and she reached down and put her hand on my leg so, I didn't say anything, I reached over and I started doing the same thing, and before we knew it we were feeling each other, and, I'm a big hand person, always wonder with my hands so I started going down her pants.  I went down the front of her pants with my hand and, ah, I started fingering her, I think.

Q    Did she ever indicate to you she didn't want you to pursue any of this?

James Prince - Direct                                    240.

        A    No.   The only indicating I got from her was to
slow down, you're being a little rough.

        Q    Up to this point in time had you ever, from the
point where you first met her to the point where we stopped at
her, did you ever say anything to her that would be an indication
that she couldn't get out of the car?

        A    Not really, no.

        Q    At some point did you have sexual intercourse
with her?

        A    Yes, we did have sexual intercourse.

        Q    At some point did you then get into an argument
with her?

        A    Yes, that arose from something that I had said.
We were-- well, after I was fingering her she said, take it easy,
it hurts, so I stopped, then I said, would you rather just, don't
want to use the exact wording, have sex, and she goes that would
be all right, so I took her pants off and she was working on
getting mine down so I helped her get mine down.  She couldn't
get her pants down all the way because she had boots on so she
kicked her boots off in the floor board of the car, and, ah,
we had sex, and about two, maybe three minutes into it, maybe a
little longer, I'm not quite sure, but two or three minutes,
that's a good average, I pulled out and I stopped, and I mumbled
it to myself, I didn't think she could hear me, I said, oh, Ron,
what am I doing and she placed me back up against the roof of the

James Prince - Direct                                              241.

car, and she goes who's this Rona bitch.  I said, this Rona bitch

happens to be my wife, you slut, and she tried to knee me in the

groin.  She got me, but not very good, so I fumbled with the

door and I got out of the car as quickly as I could before she

could try again, and while in the process I'm trying to get my

pants back on and get them pulled up.

        Q    Now, let me stop you there,

        A    At some point didn't get out of the car yet.

        Q    Which door did you get out of?

        A    The passenger door, I evacuated.

        Q    Did you have shoes on?

        A    Yes, I did.

        Q    And did you have shoes on when you got out of the car

        A    Yes.

        Q    Okay.  Now, I belive you mentioned she had taken

her boots off, do you recall whether or not she had any other

items of clothing removed completely?

        A    No, I don't think so, she might of had her jacket

off, I'm not sure.

        Q    After you got out of the car, what did she do?

        A    She demanded to me, she said if you don't want

your wife to find out about us, what has happened here tonight

you better give me some money.  I turned around, I looked, you

know, I had walked to the back of the car to stay out of the way

and I turned around and I walked back and I said, my wife and

James Prince - Direct                                                242.

I'll cross that bridge when it comes, if you go ahead and tell
her.  And I told her to get out of my car and walk, and she said,
no you're gonna take me home.  She demanded me to take her home
period, and I told her there's no way not after what you just
tried to do to me, I said, you're going to get out of the car
and walk.

       Q    Did she, in fact, get out of the car?

       A    No, she did not.

       Q    What did you do?

       A    Well, I reached in, I tried to grab her arm to
pull her out of the car and she shrugged it off and with her
other hand she hit me in the chest with the empty wine cooler
bottle, she nailed me pretty good with it, and I stepped back
kind of stunned and dazed and surprised.  And, I guess, I was
lucky I stepped back because some bottle or something went
whizzing past my head, I think it was a bottle.  Think if I
would have a couple steps closer I'd a got hit right in the face.

       Q    She actually hit you one time with the bottle?

       A    Yeah, she hit me right in the chest with it.

       Q    Okay.  Did she then pick it up again?

       A    No, I think she swung it the first time like a
club or kind jab with me, I don't know but she got me right here
in the chest.

       Q    Okay, so the first time when she hit you with the
wine bottle, she had it in her hand?

James Prince - Direct                                                    243.

A    Yeah.

Q    What happened after that then?

A    Ah, I stepped back and it went past my head. I
didn't even see it coming I just heard it go by.  You can hear
an object when it's real close, and it ruffled my hair actually.

Q    What did you do then?

A    I said, that's it, I grabbed her by the front of
her shirt and I physically yanked her out of the car.  Well, I
drug her out of the car more or less to her protest.

Q    What did you/ after you dragged her out of the car?
              do

A    Well, in dragging her out of the car, I could hear
her shirt stretching and tearing and I threw her away from me
because she was pretty irate by then, and I stepped back and
she says, now, you done it, I'll get you for this, you bastard.
I said, go ahead, go tell my wife, I don't care, my wife and I
will work that out, and she goes, no, I'm going to go to the
police, you tore my shirt, I'm going to tell them you raped me,a
and I started laughing at her, I said they would believe a
sleazy whore like you.  I said I'm a business man in this town
and then she kicked me again a second time in the groin and this
time she kicked me good.  I didn't even think she would try
again.  I don't know, she got me good, I had a reflex.  I lashed
out and I drove her with a left.

Q    When you say you drove her with a left?

A    I hit her with everythng I had before I could
go to the ground.

James Prince - Direct

244.

Q    How did you hit her?

A    A punch.

Q    You had a closed fist?

A    Yeah.

Q    Where did you hit her at?

A    I hit her in the face-- facial area.

Q    What happened after you hit her?

A    Well, she went sprawling to the ground, and I, when I stumbled backwards and slipped in the snow and went to the ground myself she-- then she started to get up and then she got back down, I got up myself and I was getting ready to shut the car door and I noticed all her stuff was in there so I grabbed her stuff and I started throwing it at her and throwing, well, I just started whipping it at her.  I said get out, walk you're not getting a ride from me, then I slammed the door and I went around to the back of the car and I slipped and fell again, and I got up and by that time I was pretty distraught and I limped, I was kind of limp from being kicked.  I staggered around, I fell one more time I think to my knees, got up, got in the car and just started driving, and started up and started driving the way we were going already.

Q    Would that have been toward Williamsport or away?

A    No, that was away from Williamsport.

Q    When you started to drive away, where was she located at?

James Prince - Direct

     A   She was behind the car, where the last of the altercation occurred she kicked me.

     Q   Was she at any time in front of the car as you were driving away?

     A   No.

     Q   Did you see her after you started to drive away?

     A   I had just saw her in the review mirrow, I looked up to make sure she was all right and I could see she was still there.

     Q   Okay.  Where did you go after you pulled out?

     A   I started down the road and I noticed I was going the wrong way to get home, and I was pretty shaken up so I looked for a place where I could turn around so I finally found a driveway and I turned around and I started out, I came back the way we had been coming toward where the scene had taken place.

     Q   When you came back down the road past her-- when y ou turned around and started coming back down that same road, did you see her as you passed the spot where you had been parked?

     A   I not only saw her, I almost ran over her because she ran out in front of the roadway with her arms like this, so I had to slide to a stop and she looked through the windshield and she looked at me and she automatically jumped on the hood of the car and started beating on the windshield screaming at me

James Prince - Direct                                          246.

again, you bastard, and I could read that word coming out of her

mouth, so I thought before she broke the windshield I better get

out of here, so I gunned it and she went flying off the side of

the car.  I drove on up to the top of the hill and my stomach

from being kicked in the groin just couldn't hold it any more,

I stopped the car in the middle of the road, then I leaned out and

I got sick.  Now, when I looked back up in the review mirrow

another car had seen the headlights coming and stopped there and

I seen her running around to get into the car.  So, I thought

well, I better see what this guys going to be all right or not

after what she just did to me I don't know so I turned around,

backed up and turned around and drove by slowly to make sure

everything was allright, and we looked at each other as we past
        and
by/then he went on, and I turned around again and followed him

back down the mountain.

         Q    When you came back into the Williamsport area,

did you see her again?

         A    No, I did not.

         Q    Did you see that car again?

         A    I don't know if it was the same car or not, but

a car pulled out behind me from the Ezi-Mart.

         Q    When you got down to the Ezi-Mart, did you pull

into the lot there and try and hit somebody's car?

         A    No, I stopped at the stop sign, went straight

across and proceeded on home.

## 4.07 (Crim) IDENTIFICATION TESTIMONY

(1)   In his testimony, (name of victim or witness) has identified the defendant as the person who committed the crime. There is a question of whether this identification is accurate.

(2)   A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. Identification testimony must be received with caution (if the witness because of bad position, poor lighting or other reasons did not have a good opportunity to observe the criminal) (if the witness in his testimony is not positive as to identity) (if the witness' positive testimony as to identity is weakened [by qualifications, hedging or inconsistencies in the rest of his testimony] [by his not identifying the defendant, or identifying someone else, as the criminal (at a lineup) (when shown photographs) (_____) before the trial]) (if, before the trial, the defendant's request for a (lineup) (_____) to test the ability of the witness to make an identification was denied and the witness subsequently made a less reliable identification) (if, _____).

(3)   *First Alternative* (Court rules as a matter of law that caution is required)

In this case (there was evidence that name of victim or witness could not see the criminal clearly) (_____). Therefore, you must consider with caution his testimony identifying the defendant as the person who committed the crime.

*Second Alternative* (When there is jury issue as to whether caution is required)

If you believe that (this factor is) (one or more of these factors are) present then you must consider with caution the testimony of name of victim or witness identifying the defendant as the person who committed the crime. If, however, you do not believe that (this factor) (at least one of these factors) is present, then you need not receive the testimony with caution; you may treat it like ordinary testimony, as a statement of fact.

(4)   You should consider all evidence relevant to the question of who committed the crime, including the testimony of (name of victim or witness), (any evidence of facts and circumstances from which identity, or non-identity, of the criminal may be inferred) (_____). You cannot find the defendant guilty unless you are satisfied beyond reasonable doubt by all the evidence, direct and circumstantial, not only that the crime was committed but that it was the defendant who committed it.

Copyright © 1985 The Pennsylvania Bar Institute

1 of 2

Date of Last Revision
August 1985

Exhibit 14

## SUBCOMMITTEE NOTE

This instruction, suitably tailored, is appropriate when a victim, or other eyewitness has testified that the defendant is the culprit and there is evidence that one or more particular factors are present which cause this identification to be of doubtful accuracy. This instruction implements the *Kloiber-Sexton* line of cases which requires that jurors be told that in the circumstances stated in subdivision (2) of the instruction they must receive identification testimony with caution. The *First Alternative* in subdivision (3) should be used when the court rules as a matter of law that the factor(s) necessitating jury caution is present. The *Second Alternative* should be used when there is a factual issue regarding the presence of the factor(s); the court may need to supplement the Second Alternative by discussing evidence and law relevant to the issue. The instruction should be given *sua sponte* if defense counsel's failure to request a charge might be ineffective representation, *cf. Commonwealth v. McKnight*, 307 Pa. Super. 213, 453 A.2d 1 (1982).

Ordinarily this charge, assuming that a factor requiring caution is present, and general instructions on evaluating testimony like Instruction 4.17 will suffice to instruct the jury on the credibility and weight of eyewitness identification testimony, *see Commonwealth v. Henderson*, 497 Pa. 23, 438 A.2d 951 (1981). For ideas on possible supplementary language regarding credibility and weight of identification testimony *see Commonwealth v. Nelson*, 298 Pa. Super. 586, 486 A.2d 1340 (1984) (quotes trial judge's charge on credibility of identification testimony); *Commonwealth v. Seaine*, _____ Pa. Super. _____, 486 A.2d 486 (1984) (potentially suggestive pretrial identification; states "well established" criteria for evaluating an identification procedure).

This instruction is derived generally from *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954) and *Commonwealth v. Henderson, supra*. For cases supporting particular portions of the charge *see Commonwealth v. Mouzon*, 456 Pa. 230, 318 A.2d 703 (1974) (poor lighting as factor requiring caution); *Commonwealth v. Sexton*, 485 Pa. Super. 17, 400 A.2d 1289 (1979) and *Commonwealth v. Morris*, 320 Pa. 166, 466 A.2d 1356 (1983) (denial of lineup and subsequent less reliable identification as requiring caution).

It has been held that the mere fact that a victim identified the defendant in a potentially suggestive, pretrial identification procedure does not necessarily mean that the victim's identification of the defendant at the trial must be received with caution, *see Commonwealth v. Wiggins*, 239 Pa. Super. 256, 361 A.2d 750 (1976). In *Wiggins* the Superior Court ruled that the failure of the trial judge to give a cautionary charge was not error because the victim's identification testimony at the trial had a basis independent of any suggestion and was positive, unshaken, and not weakened by a prior failure to identify.

The question of the admissibility of identification testimony is largely beyond the scope of this note, *e.g.*, the effect on admissibility of a pretrial violation of the defendant's right to counsel or due process rights. However, it is noted that it is not essential for admissibility that the witness be free from doubt as to the correctness of his opinion. A witness may testify that it is his belief, opinion or judgment that the accused is the person who committed the crime. The indefiniteness and uncertainty in his testimony affects its weight not its admissibility, *see Commonwealth v. Kloiber, supra*. The court may wish to instruct the jury to this effect in an appropriate case.

*Kloiber* also treats the need for circumstantial or other corroborating evidence of identity when eyewitness identification testimony is weak. Subdivision (4) of the instruction addresses this matter.

## 4.17 (Crim) CREDIBILITY OF WITNESSES, GENERAL

(1)  As judges of the facts you are sole judges of the credibility of the witnesses and their testimony. This means you must judge the truthfulness and accuracy of each witness's testimony and decide whether to believe all or part or none of that testimony. The following are some of the factors that you may and should consider when judging credibility and deciding whether or not to believe testimony:

(a)  Was the witness able to see, hear or know the things about which he testified?

(b)  How well could the witness remember and describe the things about which he testified?

[(c)  Was the ability of the witness to see, hear, know, remember or describe those things affected by youth or old age or by any physical, mental or intellectual deficiency?]

(d)  Did the witness testify in a convincing manner? (How did he look, act and speak while testifying? Was his testimony uncertain, confused, self-contradictory or evasive?)

(e)  Did the witness have any interest in the outcome of the case, bias, prejudice or other motive that might affect his testimony?

(f)  How well does the testimony of the witness square with the other evidence in the case, including the testimony of other witnesses? (Was it contradicted or supported by the other testimony and evidence? Does it make sense?).

[(g)  ————————].

[(2)  If you believe some part of the testimony of a witness to be inaccurate, consider whether the inaccuracy casts doubt upon the rest of his testimony. This may depend on whether he has been inaccurate in an important matter or a minor detail and on any possible explanation. For example, did the witness make an honest mistake or simply forget or did he deliberately falsify?]

[(3)  While you are judging the credibility of each witness you are likely to be judging the credibility of other witnesses or evidence. If there is a real, irreconcilable conflict, it is up to you to decide which, if any, conflicting testimony or evidence to believe.]

[(4)  As sole judges of credibility and fact, you the jurors are responsible to give the testimony of every witness, and all the other evidence, whatever credibility and weight you think it deserves.

Copyright - 1985 The Pennsylvania Bar Institute    1 of 2    Exhibit 15    Date of Last Revision
August 1985

## SUBCOMMITTEE NOTE

A general instruction on credibility of witnesses will be needed in most cases. This instruction, tailored to eliminate matters which are not pertinent to the particular case, will ordinarily be appropriate. For the convenience of judges who want a very brief instruction, the subcommittee has enclosed in brackets and parentheses portions that are less likely to be needed. This instruction should be supplemented as necessary with instructions concerning the defendant as a witness from Chapter III and with instructions concerning specific matters affecting credibility from this Chapter. Subdivisions (2) and (3) should be adequate to deal with the subject of conflicting testimony in many cases; for a more extensive charge see Instruction 4.09.

This instruction is largely derived from its 1978 predecessor and from Instruction 3.08, Manual of Model Jury Instructions for the Ninth Circuit (1984). The sources of the 1978 version of this instruction included *Danovitz v. Portnoy*, 399 Pa. 499, 161 A.2d 146 (1960); *Deckert v. Kulesza*, 369 Pa. 259, 85 A.2d 413 (1952) and *Commonwealth v. Dolny*, 235 Pa. Super. 241, 342 A.2d 399 (1975). In *Commonwealth v. Williams*, 323 Pa. Super. 512, 470 A.2d 1376 (1984), the Superior Court set out the trial judge's instructions, which followed the 1978 version of this instruction, and labeled them more than adequate. See *Commonwealth v. Slyman*, 334 Pa. Super. 415, 483 A.2d 519 (1984) for the text of a much briefer instruction on credibility also held adequate.

374.

to control and the intent to control that item. If you are satisfied these three elements of possessing criminal instrument have been proven beyond a reasonable doubt you should find the Defendant guilty, otherwise you must find the Defendant not guilty of this crime.

Okay. Now, I have just gone through the fourteen different charges. I now want to charge on other matters that I feel will aid you in your deliberations. I want to charge you on the credibility of witnesses because there certainly is a credibility dispute in this case. You have the sole responsibility of deciding whether the testimony of each witness in this case is truthful and accurate and is to be believed or disbelieved in whole or in part. Among the factors that you may and should consider in deciding whether a witnesses testimony is worthy of belief are the following: You should consider the witnesses manner in testifying, how he or she looked, conducted himself or herself and spoke while on the witness stand. You should consider whether the witnesses's testimony was affected by any physical or mental condition or by reason of youth, age, etc. You should consider the witnesses's intelligence and his or her ability to observe and be informed about the matters to which the witness testified. You should consider the witnesses's ability to remember the events about which the witness testified. You should consider whether the witness was positive and certain or hesitent and doubtful about the matters to which the witness testified to.

Exhibit 16

375.

You should consider whether the witness testified frankly and
fairly or whether he or she showed favoritism or was bias in
any way.  You should consider whether the witness has anything to
gain or lose from the outcome of the case, and you should
consider whether and to what extent the witnesses's testimony is
supported by or contradicted by other evidence in the case which
you believe.  After scrutinizing all the testimony and after
considering all the factors you may choose to be guided by
in your deliberations including those I've just described.  You
and you alone as the sole judges of the facts will give the
testimony of each witness such credibility if any you think it
deserves.

Now, the Defendant took the stand as a witness in
this case.  In considering the Defendant's testimony you are to
follow the general instructions I gave you for judging the
credibility of any witness.  You should not disbelieve the
defendant's testimony merely because he is the Defendant.  In
weighing his testimony, however, you may consider the fact that
he has the final interest in the outcome of this trial.  You may
take the Defendant's interest into account just as you would the
interest of any other witness along with all other facts and
circumstances bearing on credibility and making/your minds ~~what~~
up
~~weight this~~ testimony deserves.

Now, there was evidence tending to prove the
Defendant has a prior criminal conviction.  I am speaking of the

377.

believe the Defendant's explanation as to this evidence you may
consider this tending to for the Defendnat's consciousness and
guilt...You are not required to do so. You should consider and
weightthis evidence along with all the other evidence in this
case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Now, there was evidence givenin the testimony of
Officer Bowers, Sergeant Jettand Officer Songe was the . . .
Commonwealth contends to show the Defendant attempted to leave
from the place when they came to arrest him. The credibility
weight and the affect of this evidence is for you to decide.
Generally, speaking, when a crime has been committed and a person
thinks he is or may be accused of committing it and he flees or
conceals himself such flight  is a circumstance tending to
the person's consciousn of guilt such flater concealment does
not necessarily show consciousness of guilt in every case. A
person may flee for some other motive and may do so even though
innocent, whether the evidence of glight in this case should
be looked at as tending to prove guilt depends upon the facts
and circumstances of this case and especially upon motives which
may have bumped in flight. You may not find the Defendant guilty
solely on the bais of evidence of flight or attempt to flight.

Where there is a conflict in the testimony the
Jury has the duty of deciding which testimony to believe, but
you should first try to reconcile, that is, are there any conflicts

378.

in the testimony, if you can fairly do so. Discrepancies and
conflicts between testimony are different more, this may or may
not cause you to disbelive some or all their testimony.
Remember that two or more persons witnesses an incident may see
or hear it happen differently. Also it is not uncommon for a
witness to be innocently mistaken in his or her recollection
of how something happened. If you cannot reconcile conflicts
in testimony it is up to you decide which testimony if any to
believe and which you reject as untrue or inaccurate. In making
this decision consider whether the conflict involves a matter
of importance or merely some detail and whether the conflict is
brought about by an innocent mistake or by an intentional
falsehood. You should also keep in mind the other factors
already discussed which going into deciding whether or not to
believe a witness. In deciding which conflicting testimony to
believe you should not necessarily be swayed by the numbersof
wintesses on the other side. You may find the testimony of
every witness but just one witness is more believeable than the
opposing testimony by a greater number of witnesses. ON the
other hand, you should also consider the extent to which conflicting
testimony is supported by other evidence.

                    Now, we had testimony in this case which is
commonly referred to as expert testimony, and I'm referring to
the testimony of Williamsport Emergency Room Physician Dr. Arnold